IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NUANCE COMMUNICATIONS, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>OMILIA NATURAL LANGUAGE<br>SOLUTIONS, LTD.,<br><br>                    Defendant | Case No.  1:19-CV-11438-MBB<br><br>JURY TRIAL DEMANDED |

## DEFENDANT OMILIA NATURAL LANGUAGE SOLUTIONS, LTD.'S ANSWER TO COMPLAINT AND COUNTERCLAIMS

Defendant Omilia Natural Language Solutions, Ltd. ("Omilia NLS" or "Defendant"), hereby responds to the allegations of Nuance Communications, Inc.'s ("Nuance" or "Plaintiff") Complaint.  Omilia NLS hereby reserves all rights with respect to its pending Motion to Dismiss (ECF No. 14).

### NATURE OF THE ACTION

1.      Omilia NLS admits that the Complaint purports to allege an action under the patent laws of the United States, 35 U.S.C. § 271 *et seq*.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 1 of the Complaint.

2.      Omilia NLS admits it previously licensed some of Nuance's speech verification and recognition software products outside the United States.   Omilia NLS denies the remaining allegations in Paragraph 2 of the Complaint.

**PARTIES**

3.      Omilia NLS is without knowledge or information as to the allegations in Paragraph 3 of the Complaint, and therefore denies them.

4.      Omilia NLS admits it is a foreign entity formed under the laws of the country of Cyprus with a principal place of business in the country of Cyprus at Gladstonos 55, Roussos Center Point, Office 3C-3D, 3040 Limassol.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 4 of the Complaint.

**JURISDICTION AND VENUE**

5.      Omilia NLS admits that the Complaint purports to allege an action under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*  Omilia NLS further admits that this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.      Omilia NLS denies that it is subject to personal jurisdiction in this District. Omilia NLS further denies that it has committed any act of infringement and denies all remaining allegations of Paragraph 6 of the Complaint.

7.      Omilia NLS denies that it is subject to personal jurisdiction in this District. Omilia NLS further denies that it has committed any act of infringement and denies all remaining allegations of Paragraph 7 of the Complaint.

8.      Omilia NLS denies that it is subject to personal jurisdiction in this District. Omilia NLS further denies that it has committed any act of infringement and denies all remaining allegations of Paragraph 8 of the Complaint.

9.      Omilia NLS denies that it is subject to personal jurisdiction in this District. Omilia NLS further denies that it has committed any act of infringement and denies all remaining allegations of Paragraph 9 of the Complaint.

10.     Omilia NLS denies that it is subject to suit in this District under 28 U.S.C. § 1391(c)(3), as set forth in its motion to dismiss for lack of personal jurisdiction.  Except as expressly admitted herein, Omilia NLS denies that it has committed any act of infringement and denies all remaining allegations of Paragraph 10 of the Complaint.

## FACTS

### The Asserted Patents

11.     Omilia NLS admits the '905 Patent, on its face, is entitled, "In-the-field adaptation of a large vocabulary automatic speech recognizer (ASR)" and it purports to have been issued on March 17, 2009.   Omilia NLS admits that what appears to be a copy of the '905 Patent is attached as Exhibit A.  Except as expressly admitted herein, Omilia NLS lacks sufficient information to form a belief about the truth of the remaining allegations in Paragraph 11 and therefore denies them.

12.     Omilia NLS admits the '993 Patent, on its face, is entitled, "Speech recognition based on pronunciation modeling" and it purports to have been issued on September 10, 2013.   Omilia NLS admits that what appears to be a copy of the '993 Patent is attached as Exhibit B.  Except as expressly admitted herein, Omilia NLS lacks sufficient information to form a belief about the truth of the remaining allegations in Paragraph 12 and therefore denies them.

13.     Omilia NLS admits the '839 Patent, on its face, is entitled, "Using an automated speech application environment to automatically provide text exchange services" and it purports to have been issued on September 27, 2011.   Omilia NLS admits that what appears to be a copy of the '839 Patent is attached as Exhibit C.  Except

as expressly admitted herein, Omilia NLS lacks sufficient information to form a belief about the truth of the remaining allegations in Paragraph 13 and therefore denies them.

14.     Omilia NLS admits the '534 Patent, on its face, is entitled, "Dynamically extending the speech prompts of a multimodal application" and it purports to have been issued on August 27, 2013.   Omilia NLS admits that what appears to be a copy of the '534 Patent is attached as Exhibit D.  Except as expressly admitted herein, Omilia NLS lacks sufficient information to form a belief about the truth of the remaining allegations in Paragraph 14 and therefore denies them.

15.     Omilia NLS admits the '804 Patent, on its face, is entitled, "Using a complex events processor (CEP) to direct the handling of individual call sessions by an interactive voice response (IVR) system" and it purports to have been issued on February 19, 2013.   Omilia NLS admits that what appears to be a copy of the '804 Patent is attached as Exhibit E.  Except as expressly admitted herein, Omilia NLS lacks sufficient information to form a belief about the truth of the remaining allegations in Paragraph 15 and therefore denies them.

16.     Omilia NLS admits the '532 Patent, on its face, is entitled, "Supporting multi-lingual user interaction with a multimodal application" and it purports to have been issued on December 9, 2014.   Omilia NLS admits that what appears to be a copy of the '532 Patent is attached as Exhibit F.  Except as expressly admitted herein, Omilia NLS lacks sufficient information to form a belief about the truth of the remaining allegations in Paragraph 16 and therefore denies them.

17.     Omilia NLS admits the '688 Patent, on its face, is entitled, "Multi-lingual speech recognition with cross-language context modeling" and it purports to have been

issued on December 12, 2006.   Omilia NLS admits that what appears to be a copy of the '688 Patent is attached as Exhibit G.  Except as expressly admitted herein, Omilia NLS lacks sufficient information to form a belief about the truth of the remaining allegations in Paragraph 17 and therefore denies them.

18.    Omilia NLS admits the '925 Patent, on its face, is entitled, "Method and apparatus for phonetic context adaptation for improved speech recognition" and it purports to have been issued on February 14, 2006.   Omilia NLS admits that what appears to be a copy of the '925 Patent is attached as Exhibit H.  Except as expressly admitted herein, Omilia NLS lacks sufficient information to form a belief about the truth of the remaining allegations in Paragraph 18 and therefore denies them.

## OMILIA NLS' ALLEGED INFRINGING CONDUCT

19.    Omilia NLS denies the allegations in Paragraph 19 of the Complaint.

20.    Omilia NLS admits it maintains a website at omilia.com that contains statements about the company.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves. Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 20 of the Complaint.

21.    Omilia NLS admits it maintains a website at omilia.com that contains statements about the company.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves. Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 21 of the Complaint.

22.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company.   To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves. Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 22 of the Complaint.

23.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company.   To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves. Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 23 of the Complaint.

24.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company.   To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves. Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 24 of the Complaint.

25.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company.   To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves. Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 25 of the Complaint.

26.     Omilia NLS denies the allegations in Paragraph 26 of the Complaint.

27.     Omilia NLS admits it received a letter from Nuance on or around October 9, 2018.  Omilia NLS admits it sent a response letter to Nuance on or about October 22,

2018.  Omilia NLS admits it sent additional correspondence to Nuance on February 12, 2019, and March 12, 2019.  Omilia NLS admits it received correspondence from Nuance on or about March 15, 2019.  The content of the letters and correspondence speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 27 of the Complaint.

28.      Omilia NLS admits it was aware of the '839, '534, '532, '688, and '925 Patents upon the filing of the Complaint.

29.      Omilia NLS denies the allegations in Paragraph 29 of the Complaint.

30.      Omilia NLS denies the allegations in Paragraph 30 of the Complaint.

**COUNT I: ALLEGED INFRINGEMENT OF THE '905 PATENT
UNDER 35 U.S.C. § 271**

31.      Omilia NLS hereby incorporates by reference its responses to Paragraphs 1-30 of the Complaint as set forth above.

32.      Omilia NLS denies the allegations in Paragraph 32 of the Complaint.

33.      Omilia NLS admits Paragraph 33 purports to cite Claim 1 of the '905 Patent.   Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 33 of the Complaint.

34.      Omilia NLS admits it maintains a website at omilia.com that contains statements about the company.   To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 34 of the Complaint.

35.      Omilia NLS admits it maintains a website at omilia.com that contains statements about the company.   To the extent Nuance characterizes the statements

contained on Omilia NLS' website, the statements on the website speak for themselves. Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 35 of the Complaint.

36.     Omilia NLS denies the allegations in Paragraph 36 of the Complaint.

37.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company.   To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves. Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 37 of the complaint.

38.     Omilia NLS denies the allegations in Paragraph 38 of the Complaint.

39.     Omilia NLS denies the allegations in Paragraph 39 of the Complaint.

40.     Omilia NLS denies the allegations in Paragraph 40 of the Complaint.

41.     Omilia NLS admits it received correspondence from Nuance on or around October 9, 2018.  The correspondence speaks for itself.  Omilia NLS admits it maintains a website at omilia.com that contains statements about the company.   To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 41 of the Complaint.

42.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company.   To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves. Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 42 of the Complaint.

43.     Omilia NLS admits it received correspondence from Nuance on or around October 9, 2018.  The correspondence speaks for itself.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 43 of the Complaint.

44.     Omilia NLS denies the allegations in Paragraph 44 of the Complaint.

45.     Omilia NLS denies the allegations in Paragraph 45 of the Complaint.

46.     Omilia NLS denies the allegations in Paragraph 46 of the Complaint and denies that Plaintiff is entitled to any of the relief requested in Paragraph 46.

47.     Omilia NLS denies the allegations in Paragraph 47 of the Complaint and denies that Plaintiff is entitled to any of the relief requested in Paragraph 47.

## COUNT II: INFRINGEMENT OF THE '993 PATENT
## UNDER 35 U.S.C. § 271

48.     Omilia NLS hereby incorporates by reference its responses to Paragraphs 1-47 of the Complaint as set forth above.

49.     Omilia NLS denies the allegations in Paragraph 49 of the Complaint.

50.     Omilia NLS admits Paragraph 50 purports to cite Claim 17 of the '993 Patent.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 50 of the Complaint.

51.     Omilia NLS denies the allegations in Paragraph 51 of the Complaint.

52.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 52 of the Complaint.

53.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.   Omilia NLS further admits it has knowledge of the website page https://aws.amazon.com/solutions/case-studies/Omilia/ that contains statements about the company and its products.  To the extent Nuance characterizes the statements contained at the website, the statements on the website speak for themselves.  Omilia NLS lacks information or belief as to contents of the other website cited in Paragraph 53 and therefore denies the allegations as they relate to that website.  Except as expressly admitted herein, Omilia NLS further denies the remaining allegations in Paragraph 53 of the Complaint.

54.     Omilia NLS denies the allegations in Paragraph 54 of the Complaint.

55.     Omilia NLS denies the allegations in Paragraph 55 of the Complaint.

56.     Omilia NLS admits it received correspondence from Nuance on or around October 9, 2018.  The correspondence speaks for itself.  Omilia NLS further admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 56 of the Complaint.

57.     Omilia NLS denies the allegations in Paragraph 57 of the Complaint.

58.     Omilia NLS admits it received correspondence from Nuance on or around October 9, 2018.  The correspondence speaks for itself.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 58 of the Complaint.

59.     Omilia NLS denies the allegations in Paragraph 59 of the Complaint.

60.     Omilia NLS denies the allegations in Paragraph 60 of the Complaint.

61.     Omilia NLS denies the allegations in Paragraph 61 of the Complaint and denies that Plaintiff is entitled to any of the relief requested in Paragraph 61.

62.     Omilia NLS denies the allegations in Paragraph 62 of the Complaint and denies that Plaintiff is entitled to any of the relief requested in Paragraph 62.

### COUNT III: ALLEGED INFRINGEMENT OF THE '839 PATENT UNDER 35 U.S.C. § 271

63.     Omilia NLS hereby incorporates by reference its responses to Paragraphs 1-62 of the Complaint as set forth above.

64.     Omilia NLS denies the allegations in Paragraph 64 of the Complaint.

65.     Omilia NLS admits Paragraph 65 purports to cite Claim 17 of the '839 Patent.   Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 65 of the Complaint.

66.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 66 of the Complaint.

67.     Omilia NLS denies the allegations in Paragraph 67 of the Complaint.

68.     Omilia NLS denies the allegations in Paragraph 68 of the Complaint.

69.     Omilia NLS denies all allegations in Paragraph 69 of the Complaint.

70.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the

statements contained on Omilia NLS' website, the statements on the website speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 70 of the Complaint.

71.     Omilia NLS admits it has knowledge of the '839 Patent from the Complaint.  Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 71 of the Complaint.

72.     Omilia NLS denies the allegations in Paragraph 72 of the Complaint.

73.     Omilia NLS admits it has knowledge of the '839 Patent from the Complaint.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 73 of the Complaint.

74.     Omilia NLS denies the allegations in Paragraph 74 of the Complaint.

75.     Omilia NLS denies the allegations in Paragraph 75 of the Complaint and denies that Plaintiff is entitled to any of the relief requested in Paragraph 75.

76.     Omilia NLS denies the allegations in Paragraph 76 of the Complaint and denies that Plaintiff is entitled to any of the relief requested in Paragraph 76.

### COUNT IV: ALLEGED INFRINGEMENT OF THE '534 PATENT UNDER 35 U.S.C. § 271

77.     Omilia NLS hereby incorporates by reference its responses to Paragraphs 1-76 of the Complaint as set forth above.

78.     Omilia NLS denies the allegations in Paragraph 78 of the Complaint.

79.     Omilia NLS admits Paragraph 79 purports to cite Claim 13 of the '534 Patent.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 79 of the Complaint.

80.     Omilia NLS denies the allegations in Paragraph 80 of the Complaint.

81.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 81 of the Complaint.

82.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 82 of the Complaint.

83.     Omilia NLS denies the allegations in Paragraph 83 of the Complaint.

84.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 84 of the Complaint.

85.     Omilia NLS admits it has knowledge of the '534 Patent from the Complaint.  Omilia NLS further admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the

statements contained on Omilia NLS' website, the statements on the website speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 85 of the Complaint.

86.    Omilia NLS denies the allegations in Paragraph 86 of the Complaint.

87.    Omilia NLS admits it has knowledge of the '534 Patent from the Complaint.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 87 of the Complaint.

88.    Omilia NLS denies the allegations in Paragraph 88 of the Complaint.

89.    Omilia NLS denies the allegations in Paragraph 89 of the Complaint and denies that Plaintiff is entitled to any of the relief requested in Paragraph 89.

90.    Omilia NLS denies the allegations in Paragraph 90 of the Complaint and denies that Plaintiff is entitled to any of the relief requested in Paragraph 90.

### COUNT V: ALLEGED INFRINGEMENT OF THE '804 PATENT UNDER 35 U.S.C. § 271

91.    Omilia NLS hereby incorporates by reference its responses to Paragraphs 1-90 of the Complaint as set forth above.

92.    Omilia NLS denies the allegations in Paragraph 92 of the Complaint.

93.    Omilia NLS admits Paragraph 93 purports to cite Claim 1 of the '804 Patent.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 93 of the Complaint.

94.    Omilia NLS denies the allegations in Paragraph 94 of the Complaint.

95.    Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for

themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 95 of the Complaint.

96.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 96 of the Complaint.

97.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 97 of the Complaint.

98.     Omilia NLS denies the allegations in Paragraph 98 of the Complaint.

99.     Omilia NLS admits it received correspondence from Nuance on or around October 9, 2018.  The correspondence speaks for itself.  Omilia NLS further admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 99 of the Complaint.

100.     Omilia NLS denies the allegations in Paragraph 100 of the Complaint.

101.     Omilia NLS admits it received correspondence from Nuance on or around October 9, 2018.  The correspondence speaks for itself.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 101 of the Complaint.

102.     Omilia NLS denies the allegations in Paragraph 102 of the Complaint.

103.     Omilia NLS denies the allegations in Paragraph 103 of the Complaint.

104.     Omilia NLS denies the allegations in Paragraph 104 of the Complaint and denies that Plaintiff is entitled to any of the relief requested in Paragraph 104.

105.     Omilia NLS denies the allegations in Paragraph 105 of the Complaint and denies that Plaintiff is entitled to any of the relief requested in Paragraph 105.

## COUNT VI: ALLEGED INFRINGEMENT OF THE '532 PATENT UNDER 35 U.S.C. § 271

106.     Omilia NLS hereby incorporates by reference its responses to Paragraphs 1-105 of the Complaint as set forth above.

107.     Omilia NLS denies the allegations in Paragraph 107 of the Complaint.

108.     Omilia NLS admits Paragraph 108 purports to cite Claim 1 of the '532 Patent.   Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 108 of the Complaint.

109.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 109 of the Complaint.

110.     Omilia NLS denies the allegations in Paragraph 110 of the Complaint.

111.     Omilia NLS denies the allegations in Paragraph 111 of the Complaint.

112.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for

themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 112 of the Complaint.

113.    Omilia NLS denies the allegations in Paragraph 113 of the Complaint.

114.    Omilia NLS admits it has knowledge of the '532 Patent from the Complaint.  Omilia NLS further admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 114 of the Complaint.

115.    Omilia NLS denies the allegations in Paragraph 115 of the Complaint.

116.    Omilia NLS admits it has knowledge of the '532 Patent from the Complaint.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 116 of the Complaint.

117.    Omilia NLS denies the allegations in Paragraph 117 of the Complaint.

118.    Omilia NLS denies the allegations in Paragraph 118 of the Complaint and denies that Plaintiff is entitled to any of the relief requested in Paragraph 118.

119.    Omilia NLS denies the allegations in Paragraph 119 of the Complaint and denies that Plaintiff is entitled to any of the relief requested in Paragraph 119.

## COUNT VII: ALLEGED INFRINGEMENT OF THE '688 PATENT UNDER 35 U.S.C. § 271

120.    Omilia NLS hereby incorporates by reference its responses to Paragraphs 1-119 of the Complaint as set forth above.

121.    Omilia NLS denies the allegations in Paragraph 121 of the Complaint.

122.     Omilia NLS admits Paragraph 122 purports to cite Claim 1 of the '688 Patent.   Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 122 of the Complaint.

123.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.   To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.   Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 123 of the Complaint.

124.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.   To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.   Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 124 of the Complaint.

125.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.   To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.   Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 125 of the Complaint.

126.     Omilia NLS denies the allegations in Paragraph 126 of the Complaint.

127.     Omilia NLS denies the allegations in Paragraph 127 of the Complaint.

128.     Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.   To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for

themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 128 of the Complaint.

129.    Omilia NLS denies the allegations in Paragraph 129 of the Complaint.

130.    Omilia NLS admits it has knowledge of the '688 Patent from the Complaint.  Omilia NLS further admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 130 of the Complaint.

131.    Omilia NLS denies the allegations in Paragraph 131 of the Complaint.

132.    Omilia NLS admits it has knowledge of the '688 Patent from the Complaint.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 132 of the Complaint.

133.    Omilia NLS denies the allegations in Paragraph 133 of the Complaint.

134.    Omilia NLS denies the allegations in Paragraph 134 of the Complaint and denies that Plaintiff is entitled to any of the relief requested in Paragraph 134.

135.    Omilia NLS denies the allegations in Paragraph 135 of the Complaint and denies that Plaintiff is entitled to any of the relief requested in Paragraph 135.

## COUNT VIII: ALLEGED INFRINGEMENT OF THE '925 PATENT UNDER 35 U.S.C. § 271

136.    Omilia NLS hereby incorporates by reference its responses to Paragraphs 1-135 of the Complaint as set forth above.

137.    Omilia NLS denies the allegations in Paragraph 137 of the Complaint.

19

138.    Omilia NLS admits Paragraph 138 purports to cite Claim 27 of the '925 Patent.   Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 138 of the Complaint.

139.    Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.   To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.   Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 139 of the Complaint.

140.    Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.   To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.   Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 140 of the Complaint.

141.    Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.   To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.   Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 141 of the Complaint.

142.    Omilia NLS denies the allegations in Paragraph 142 of the Complaint.

143.    Omilia NLS admits it maintains a website at omilia.com that contains statements about the company and its products.   To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for

themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 143 of the Complaint.

144.    Omilia NLS denies the allegations in Paragraph 144 of the Complaint.

145.    Omilia NLS admits it has knowledge of the '925 Patent from the Complaint.  Omilia NLS further admits it maintains a website at omilia.com that contains statements about the company and its products.  To the extent Nuance characterizes the statements contained on Omilia NLS' website, the statements on the website speak for themselves.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 145 of the Complaint.

146.    Omilia NLS denies the allegations in Paragraph 146 of the Complaint.

147.    Omilia NLS admits it has knowledge of the '925 Patent from the Complaint.  Except as expressly admitted herein, Omilia NLS denies the allegations in Paragraph 147 of the Complaint.

148.    Omilia NLS denies the allegations in Paragraph 148 of the Complaint.

149.    Omilia NLS denies the allegations in Paragraph 149 of the Complaint and denies that Plaintiff is entitled to any of the relief requested in Paragraph 149.

150.    Omilia NLS denies the allegations in Paragraph 150 of the Complaint and denies that Plaintiff is entitled to any of the relief requested in Paragraph 150.

## **RESPONSE TO NUANCE'S PRAYER FOR RELIEF**

Omilia NLS denies that Nuance is entitled to any of the relief sought in the Complaint or to any other relief against Omilia NLS by virtue of this Complaint.

**AFFIRMATIVE DEFENSES**

Without assuming any burden it would not otherwise bear, and reserving its right to amend its Answer to assert additional defenses as they may become known during discovery, Omilia NLS asserts the following separate and additional defenses.  Nothing in these defenses is intended to or shall be construed as an argument or admission that Omilia NLS bears the burden of proof as to any matter raised in any of its defenses.

**FIRST DEFENSE**

The Complaint, and each cause of action within it, fails to state a claim upon which relief can be granted.

**SECOND DEFENSE**

Omilia NLS has not infringed and is not infringing any claim of U.S. Patent Nos. 7,505,905 ("the '905 Patent"), 8,532,993 ("the '993 Patent"), 8,027,839 ("the '839 Patent"), 8,521,534 ("the '534 Patent"), 8,379,804 ("the '804 Patent"), 8,909,532 ("the '532 Patent"), 7,149,688 ("the '688 Patent"), and 6,999,925 ("the '925 Patent") (collectively, the "patents-in-suit"), either literally and/or under the doctrine of equivalents.

**THIRD DEFENSE**

The claims of the patents-in-suit are invalid, void, and/or unenforceable for failure to satisfy the conditions for patentability set forth in Title 35 of the United States Code, including without limitation 35 U.S.C. §§ 101 *et seq*.

## FOURTH DEFENSE

Plaintiff is estopped from construing any valid claim of the patents-in-suit to cover or include, either literally or by application of the doctrine of equivalents, any product manufactured, used, imported, sold, or offered by Omilia NLS because of admissions and statements to the United States Patent and Trademark Office in the specification of those patents and during prosecution of the applications leading to the issuance of those patents.

## FIFTH DEFENSE

Plaintiff's claims for damages, if any, for alleged infringement of the patents-in-suit are limited by 35 U.S.C. §§ 286 and 287.

## SIXTH DEFENSE

Plaintiff's claims are barred by its failure to mitigate damages.

## SEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by consent, acquiescence, and license.

## EIGHTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by equitable doctrines of waiver, unclean hands, and estoppel.

## NINTH DEFENSE

Plaintiff is barred from obtaining a finding of willfulness or receiving enhanced damages because it has failed to set forth facts alleging reprehensible culpability on the

part of Omilia NLS, which is prerequisite for a finding of willfulness and an award of enhanced damages.

### TENTH DEFENSE

Plaintiff is not entitled to injunctive relief because any injury is not immediate and/or irreparable, and because Plaintiff has adequate remedies at law.

### ELEVENTH DEFENSE

Plaintiff's recovery of costs is barred by 35 U.S.C. § 288.

### RESERVATION OF ADDITIONAL DEFENSES

Omilia NLS reserves any and all additional defenses available under Section 35 of the United States Code, the rules, regulations, or law related thereto, the Federal Rules of Civil Procedure, the Rules of this Court, and/or otherwise in law or equity, now existing, or later arising, as may be discovered.

## COUNTERCLAIMS

1.      Counterclaim-Plaintiff Omilia NLS incorporates by reference the admissions, allegations, denials, and additional defenses in the answer above as if fully set forth herein. Omilia NLS counterclaims as follows.

2.      Omilia NLS is a corporation organized under the laws of the country of Cyprus with a principal place of business Gladstonos 55, Roussos Center Point, Office 3C-3D, 3040 Limassol.

3.      On information and belief, Nuance Communications, Inc. formed under the laws of Delaware and has a principal place of business at 1 Wayside Road, Burlington, Massachusetts.

## JURISDICTION AND VENUE

4.      Subject to its defenses and denials, Omilia NLS alleges this Court has subject matter jurisdiction over these counterclaims under 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

5.      Nuance is subject to personal jurisdiction in this district at least because they have voluntarily appeared and consented to this district by filing their patent infringement claims in this district.

## FACTUAL BACKGROUND

6.      In its Complaint, Nuance asserts Omilia NLS has infringed U.S. Patent Nos. 7,505,905 ("the '905 Patent"), 8,532,993 ("the '993 Patent"), 8,027,839 ("the '839 Patent"), 8,521,534 ("the '534 Patent"), 8,379,804 ("the '804 Patent"), 8,909,532 ("the '532 Patent"), 7,149,688 ("the '688 Patent"), and 6,999,925 ("the '925 Patent").

7.     Omilia NLS has not infringed and does not infringe any valid or enforceable claim of the '905 Patent, the '993 Patent, the '839 Patent, the '534 Patent, the '804 Patent, the '532 Patent, the '688 Patent, or the '925 Patent.

8.     The '905 Patent, the '993 Patent, the '839 Patent, the '534 Patent, the '804 Patent, the '532 Patent, the '688 Patent, and the '925 Patent are invalid and unenforceable.

9.     Consequently, there is an actual case or controversy between Omilia NLS and Nuance over the non-infringement, validity, and unenforceability of the '905 Patent, the '993 Patent, the '839 Patent, the '534 Patent, the '804 Patent, the '532 Patent, the '688 Patent, and the '925 Patent.

## COUNT 1

### (Declaratory Judgement of Non-Infringement of the '905 patent)

10.     Omilia NLS repeats and re-alleges paragraphs 1-9 of these counterclaims as if fully set forth herein.

11.     An actual case or controversy exists between Omilia NLS and Nuance as to whether the claims of the '905 patent are not infringed by Omilia NLS.

12.     A judicial declaration is necessary and appropriate so that Omilia NLS may ascertain its rights as to the '905 patent.

13.     Omilia NLS has not in the past, and does not now, make, use, sell, offer to sell, or import any products that infringe any valid claim of the '905 patent, either directly or indirectly, and Omilia NLS does not and has not infringed, contributed to the infringement of, or induced infringement of any valid claim of the '905 patent either literally or under the doctrine of equivalents.

14.     Omilia NLS therefore seeks judicial declaration that it has not and does not infringe any valid or enforceable claim of the '905 patent.

**COUNT 2**

**(Declaratory Judgement of Invalidity and Unenforceability of the '905 patent)**

15.     Omilia NLS repeats and re-alleges paragraphs 1-14 of these counterclaims as if fully set forth herein.

16.     An actual case or controversy exists between Omilia NLS and Nuance as to whether the claims of the '905 patent are invalid and unenforceable.

17.     A judicial declaration is necessary and appropriate so that Omilia NLS may ascertain its rights as to the '905 patent.

18.     The claims of the '905 patent are invalid for failure to comply with the patent laws, including without limitation 35 U.S.C. §§ 102, 103, and/or 112.   For example, and subject to further investigation, in addition to prior art identified in the patents and file histories, and without limitation, at least one or more of the below references, individually or in combination, render the claims invalid:

    a.   U.S. Patent No. 5,865,626 to Beattie et al.; and

    b.   Makhoul and Schwartz, State of the art in continuous speech recognition, Proc. Natl. Acad. Sci. USA Vol. 92, 9956-9963 (Oct. 1995).

19.     Omilia NLS therefore seeks judicial declaration that the claims of the '905 patent are invalid and unenforceable.

**COUNT 3**

**(Declaratory Judgement of Non-Infringement of the '993 patent)**

20.     Omilia NLS repeats and re-alleges paragraphs 1-19 of these counterclaims as if fully set forth herein.

21.     An actual case or controversy exists between Omilia NLS and Nuance as to whether the claims of the '993 patent are not infringed by Omilia NLS.

22.     A judicial declaration is necessary and appropriate so that Omilia NLS

may ascertain its rights as to the '993 patent.

23.     Omilia NLS has not in the past, and does not now, make, use, sell, offer to sell, or import any products that infringe any valid claim of the '993 patent, either directly or indirectly, and Omilia NLS does not and has not infringed, contributed to the infringement of, or induced infringement of any valid claim of the '993 patent either literally or under the doctrine of equivalents.

24.     Omilia NLS therefore seeks judicial declaration that it has not and does not infringe any valid or enforceable claim of the '993 patent.

## COUNT 4

**(Declaratory Judgement of Invalidity and Unenforceability of the '993 patent)**

25.     Omilia NLS repeats and re-alleges paragraphs 1-24 of these counterclaims as if fully set forth herein.

26.     An actual case or controversy exists between Omilia NLS and Nuance as to whether the claims of the '993 patent are invalid and unenforceable.

27.     A judicial declaration is necessary and appropriate so that Omilia NLS may ascertain its rights as to the '993 patent.

28.     The claims of the '993 patent are invalid for failure to comply with the patent laws, including without limitation 35 U.S.C. §§ 102, 103, and/or 112.  For example, and subject to further investigation, in addition to prior art identified in the patents and file histories, and without limitation, at least one or more of the below references, individually or in combination, render the claims invalid:

    a.  Mirjam Wester, Pronunciation Variation Modeling for Dutch Automatic Speech Recognition (2002);

b.   Steinbiss et al., *The Philips research system for large-vocabulary continuous-speech recognition*, Proc. of 3rd European Conference on Speech Communication and Technology, EUROSPEECH '93, 2125-2128 (1993); and

c.   Bahl et al., Context Dependent Modeling of Phones in Continuous Speech Using Decision Trees, HLT '91 Proceedings of the workshop on Speech and Natural Language (1991) 264-269.

d.   John Eric Fosler-Lussier, Dynamic pronunciation models for automatic speech recognition,  University of California, Berkeley (1999)

29.   Omilia NLS therefore seeks judicial declaration that the claims of the '993 patent are invalid and unenforceable.

## COUNT 5

### (Declaratory Judgement of Non-Infringement of the '839 patent)

30.   Omilia NLS repeats and re-alleges paragraphs 1-29 of these counterclaims as if fully set forth herein.

31.   An actual case or controversy exists between Omilia NLS and Nuance as to whether the claims of the '839 patent are not infringed by Omilia NLS.

32.   A judicial declaration is necessary and appropriate so that Omilia NLS may ascertain its rights as to the '839 patent.

33.   Omilia NLS has not in the past, and does not now, make, use, sell, offer to sell, or import any products that infringe any valid claim of the '839 patent, either directly or indirectly, and Omilia NLS does not and has not infringed, contributed to the infringement of, or induced infringement of any valid claim of the '839 patent either literally or under the doctrine of equivalents.

34.     Omilia NLS therefore seeks judicial declaration that it has not and does not infringe any valid or enforceable claim of the '839 patent.

## COUNT 6

### (Declaratory Judgement of Invalidity and Unenforceability of the '839 patent)

35.     Omilia NLS repeats and re-alleges paragraphs 1-34 of these counterclaims as if fully set forth herein.

36.     An actual case or controversy exists between Omilia NLS and Nuance as to whether the claims of the '839 patent are invalid and unenforceable.

37.     A judicial declaration is necessary and appropriate so that Omilia NLS may ascertain its rights as to the '839 patent.

38.     The claims of the '839 patent are invalid for failure to comply with the patent laws, including without limitation 35 U.S.C. §§ 102, 103, and/or 112.  For example, and subject to further investigation, in addition to prior art identified in the patents and file histories, and without limitation, at least one or more of the below references, individually or in combination, render the claims invalid:

 a.  U.S. Patent No. 6,763,089 to Feigenbaum;

 b.  U.S. Patent No. 6,389,114 to Dowens et al.;

 c.  U.S. Patent No. 7,310,329 to Vieri et al.;

 d.  Netherlands Patent No. NL1026519C to Snip et al.; and

 e.  Glaser et al., Preparation of Deaf end-users and the SoftBridge for semi-automated relay trials, Depts. of Health and Rehabilitation, Computer Science and Electrical Engineering, University of Cape Town, 2004

39.     Omilia NLS therefore seeks judicial declaration that the claims of the '839

patent are invalid and unenforceable.

## COUNT 7

### (Declaratory Judgement of Non-Infringement of the '534 patent)

40.     Omilia NLS repeats and re-alleges paragraphs 1-39 of these counterclaims as if fully set forth herein.

41.     An actual case or controversy exists between Omilia NLS and Nuance as to whether the claims of the '534 patent are not infringed by Omilia NLS.

42.     A judicial declaration is necessary and appropriate so that Omilia NLS may ascertain its rights as to the '534 patent.

43.     Omilia NLS has not in the past, and does not now, make, use, sell, offer to sell, or import any products that infringe any valid claim of the '534 patent, either directly or indirectly, and Omilia NLS does not and has not infringed, contributed to the infringement of, or induced infringement of any valid claim of the '534 patent either literally or under the doctrine of equivalents.

44.     Omilia NLS therefore seeks judicial declaration that it has not and does not infringe any valid or enforceable claim of the '534 patent.

## COUNT 8

### (Declaratory Judgement of Invalidity and Unenforceability of the '534 patent)

45.     Omilia NLS repeats and re-alleges paragraphs 1-44 of these counterclaims as if fully set forth herein.

46.     An actual case or controversy exists between Omilia NLS and Nuance as to whether the claims of the '534 patent are invalid and unenforceable.

47.     A judicial declaration is necessary and appropriate so that Omilia NLS

may ascertain its rights as to the '534 patent.

48.     The claims of the '534 patent are invalid for failure to comply with the patent laws, including without limitation 35 U.S.C. §§ 102, 103, and/or 112.   For example, and subject to further investigation, in addition to prior art identified in the patents and file histories, and without limitation, at least one or more of the below references, individually or in combination, render the claims invalid:

      a.   Paek, et al., Handling Out-of-Grammar Commands in Mobile Speech Interaction Using Backoff Filler Models, Proceedings of the ACL Workshop on Grammar-Based Approaches to Spoken Language Processing (SPEECHGRAM) (2007), pp. 33-40;

      b.   U.S. Patent No. 8,244,545 to Paek et al.;

      c.   U.S. Patent No. 8,694,322 to Snitkovskiy et al.;

      d.   U.S. Patent No. 8,326,637 to Baldwin et al.;

      e.   U.S. Patent No. 6,144,938 to Surace et al.; and

      f.   U.S. Patent No. 7,620,549 to Di Cristo et al.

49.     Omilia NLS therefore seeks judicial declaration that the claims of the '534 patent are invalid and unenforceable.

## COUNT 9

### (Declaratory Judgement of Non-Infringement of the '804 patent)

50.     Omilia NLS repeats and re-alleges paragraphs 1-49 of these counterclaims as if fully set forth herein.

51.     An actual case or controversy exists between Omilia NLS and Nuance as to whether the claims of the '804 patent are not infringed by Omilia NLS.

52.     A judicial declaration is necessary and appropriate so that Omilia NLS may ascertain its rights as to the '804 patent.

53.     Omilia NLS has not in the past, and does not now, make, use, sell, offer to sell, or import any products that infringe any valid claim of the '804 patent, either directly or indirectly, and Omilia NLS does not and has not infringed, contributed to the infringement of, or induced infringement of any valid claim of the '804 patent either literally or under the doctrine of equivalents.

54.     Omilia NLS therefore seeks judicial declaration that it has not and does not infringe any valid or enforceable claim of the '804 patent.

## COUNT 10

### (Declaratory Judgement of Invalidity and Unenforceability of the '804 patent)

55.     Omilia NLS repeats and re-alleges paragraphs 1-54 of these counterclaims as if fully set forth herein.

56.     An actual case or controversy exists between Omilia NLS and Nuance as to whether the claims of the '804 patent are invalid and unenforceable.

57.     A judicial declaration is necessary and appropriate so that Omilia NLS may ascertain its rights as to the '804 patent.

58.     The claims of the '804 patent are invalid for failure to comply with the patent laws, including without limitation 35 U.S.C. §§ 102, 103, and/or 112.  For example, and subject to further investigation, in addition to prior art identified in the patents and file histories, and without limitation, at least one or more of the below references, individually or in combination, render the claims invalid:

   a.  U.S. Patent No. 7,698,435 to Paterik et al.;

b.   U.S. Patent No. 7,558,861 to Qidwai et al.;

c.   U.S. Patent No. 7,292,689 to Odinak et al.;

d.   Voice Extensible Markup Language (VoiceXML) Version 2.0 (Apr. 24, 2002 Working Draft of World Wide Web Consortium);

e.   Rosenberg et al., SIP: Session Initiation Protocol, Request for Comments 3261 (June 2002);

f.   Speech Recognition Grammar Specification Version 1.0 (August 20, 2001 Working Draft of World Wide Web Consortium);

g.   Complex Event Processing (February 4, 2007, Dr. Asaf Adi, IBM Haifa Labs); and

h.   Voice Browser Call Control: CCXML Version 1.0 (January 19, 2007, W3C Working Draft).

59.   Omilia NLS therefore seeks judicial declaration that the claims of the '804 patent are invalid and unenforceable.

## COUNT 11

### (Declaratory Judgement of Non-Infringement of the '532 patent)

60.   Omilia NLS repeats and re-alleges paragraphs 1-59 of these counterclaims as if fully set forth herein.

61.   An actual case or controversy exists between Omilia NLS and Nuance as to whether the claims of the '532 patent are not infringed by Omilia NLS.

62.   A judicial declaration is necessary and appropriate so that Omilia NLS may ascertain its rights as to the '532 patent.

63.   Omilia NLS has not in the past, and does not now, make, use, sell, offer to

sell, or import any products that infringe any valid claim of the '532 patent, either directly or indirectly, and Omilia NLS does not and has not infringed, contributed to the infringement of, or induced infringement of any valid claim of the '532 patent either literally or under the doctrine of equivalents.

64.     Omilia NLS therefore seeks judicial declaration that it has not and does not infringe any valid or enforceable claim of the '532 patent.

## COUNT 12

**(Declaratory Judgement of Invalidity and Unenforceability of the '532 patent)**

65.     Omilia NLS repeats and re-alleges paragraphs 1-64 of these counterclaims as if fully set forth herein.

66.     An actual case or controversy exists between Omilia NLS and Nuance as to whether the claims of the '532 patent are invalid and unenforceable.

67.     A judicial declaration is necessary and appropriate so that Omilia NLS may ascertain its rights as to the '532 patent.

68.     The claims of the '532 patent are invalid for failure to comply with the patent laws, including without limitation 35 U.S.C. §§ 102, 103, and/or 112.  For example, and subject to further investigation, in addition to prior art identified in the patents and file histories, and without limitation, at least one or more of the below references, individually or in combination, render the claims invalid:

    a.  U.S. Patent No. 7,478,171 to Ramaswamy et al.;

    b.  U.S. Patent Application Publication No. 2008/0262848, Shienbrood et al.;

    c.  U.S. Patent Application Publication No. 2010/0049619, Beck;

    d.  U.S. Patent No. 7,640,159 to Reich;

     e.   U.S. Patent No. 7,660,719 to Damiba et al.;

     f.   U.S. Patent No. 7,487,440 to Gergic et al.; and

     g.   U.S. Patent No. 7,277,854 to Bennett et al.

69.    Omilia NLS therefore seeks judicial declaration that the claims of the '532 patent are invalid and unenforceable.

## COUNT 13

### (Declaratory Judgement of Non-Infringement of the '688 patent)

70.    Omilia NLS repeats and re-alleges paragraphs 1-69 of these counterclaims as if fully set forth herein.

71.    An actual case or controversy exists between Omilia NLS and Nuance as to whether the claims of the '688 patent are not infringed by Omilia NLS.

72.    A judicial declaration is necessary and appropriate so that Omilia NLS may ascertain its rights as to the '688 patent.

73.    Omilia NLS has not in the past, and does not now, make, use, sell, offer to sell, or import any products that infringe any valid claim of the '688 patent, either directly or indirectly, and Omilia NLS does not and has not infringed, contributed to the infringement of, or induced infringement of any valid claim of the '688 patent either literally or under the doctrine of equivalents.

74.    Omilia NLS therefore seeks judicial declaration that it has not and does not infringe any valid or enforceable claim of the '688 patent.

## COUNT 14

### (Declaratory Judgement of Invalidity and Unenforceability of the '688 patent)

75.    Omilia NLS repeats and re-alleges paragraphs 1-74 of these counterclaims

as if fully set forth herein.

76.     An actual case or controversy exists between Omilia NLS and Nuance as to whether the claims of the '688 patent are invalid and unenforceable.

77.     A judicial declaration is necessary and appropriate so that Omilia NLS may ascertain its rights as to the '688 patent.

78.     The claims of the '688 patent are invalid for failure to comply with the patent laws, including without limitation 35 U.S.C. §§ 102, 103, and/or 112.   For example, and subject to further investigation, in addition to prior art identified in the patents and file histories, and without limitation, at least one or more of the below references, individually or in combination, render the claims invalid:

    a.   U.S. Patent No. 5,862,519 to Sharma et al.;

    b.   U.S. Patent No. 6,374,210 to Chu;

    c.   U.S. Patent No. 6,738,741 to Emam et al.;

    d.   U.S. Patent No. 6,999,925 to Fischer at al.;

    e.   U.S. Patent No. 6,882,970 to Garner et al.;

    f.   U.S. Patent No. 7,295,979 to Neti et al.;

    g.   U.S. Patent No. 7,043,431 to Riis et al.; and

    h.   U.S. Patent No. 7,292,979 to Karas et al.

79.     Omilia NLS therefore seeks judicial declaration that the claims of the '688 patent are invalid and unenforceable.

## COUNT 15

### (Declaratory Judgement of Non-Infringement of the '925 patent)

80.     Omilia NLS repeats and re-alleges paragraphs 1-79 of these counterclaims

as if fully set forth herein.

81.     An actual case or controversy exists between Omilia NLS and Nuance as to whether the claims of the '925 patent are not infringed by Omilia NLS.

82.     A judicial declaration is necessary and appropriate so that Omilia NLS may ascertain its rights as to the '925 patent.

83.     Omilia NLS has not in the past, and does not now, make, use, sell, offer to sell, or import any products that infringe any valid claim of the '925 patent, either directly or indirectly, and Omilia NLS does not and has not infringed, contributed to the infringement of, or induced infringement of any valid claim of the '925 patent either literally or under the doctrine of equivalents.

84.     Omilia NLS therefore seeks judicial declaration that it has not and does not infringe any valid or enforceable claim of the '925 patent.

## COUNT 16

### (Declaratory Judgement of Invalidity and Unenforceability of the '925 patent)

85.     Omilia NLS repeats and re-alleges paragraphs 1-84 of these counterclaims as if fully set forth herein.

86.     An actual case or controversy exists between Omilia NLS and Nuance as to whether the claims of the '925 patent are invalid and unenforceable.

87.     A judicial declaration is necessary and appropriate so that Omilia NLS may ascertain its rights as to the '925 patent.

88.     The claims of the '925 patent are invalid for failure to comply with the patent laws, including without limitation 35 U.S.C. §§ 102, 103, and/or 112.  For example, and subject to further investigation, in addition to prior art identified in the

patents and file histories, and without limitation, at least one or more of the below references, individually or in combination, render the claims invalid:

    a.   U.S. Patent No. 6,912,499 to Sabourin et al.;

    b.   U.S. Patent No. 6,336,108 to Thiesson et al.;

    c.   U.S. Patent No. 7,216,079 to Barnard et al.;

    d.   U.S. Patent No. 7,043,422 to Gao et al.;

    e.   U.S. Patent Application Publication No. 2008/0147404, Liu et al.; and

    f.   Duchateau et al., A Novel Node Splitting Criterion in Decision Tree Construction for Semi-Continuous HMMS, Proceedings of 5th European Conference on Speech Communication and Technology, EUROSPEECH '97 (1997).

    89.   Omilia NLS therefore seeks judicial declaration that the claims of the '925 patent are invalid and unenforceable.

## INTRODUCTION TO FEDERAL ANTITRUST AND STATE
## UNFAIR COMPETITION COUNTERCLAIMS

90.     Nuance is a multi-billion dollar conglomerate built by more than a decade of predatory acquisitions of competitors, including nascent competitors, patent assets, and competing technologies intended to ensure that Nuance, and Nuance technology, maintain a dominant position in the market.

91.     Beginning in 2001, Nuance (and/or its predecessor ScanSoft, Inc. ("ScanSoft")) has embarked on a widespread, anticompetitive overall scheme to acquire rival automated speech recognition ("ASR") technology providers and patent assets in a manner that has effectively eliminated all meaningful competition in the market.  It has carried out this scheme by, among other things, acquiring a patent portfolio comprising more than 5,000 patents relating to ASR software and other technologies, and threatening to assert or actually asserting objectively baseless patent lawsuits, including the instant lawsuit, against its actual and potential competitors, with the primary purpose of inflicting reputational and economic harm on those companies, driving them out of business as a result of the substantial resources required to defend those lawsuits, and/or forcing them to agree to be acquired by Nuance.  As explained below, Nuance's scheme has harmed competition in the relevant market in so far as it has, among other things, enabled Nuance to charge supra-competitive prices for its products and/or professional services to the ultimate detriment of customers and consumers of ASR technology.

92.     Nuance's scheme has included disseminating to the marketplace generally, and to its competitors' customers and resellers specifically, baseless and defamatory allegations made without regard to the merits of the claims that its competitors infringe one or more of Nuance's patents, both before and after filing suits on such theories, in

order to induce those customers and resellers to switch to Nuance as their supplier, among other acts of economic interference. As explained below, Omilia NLS, a competitor of Nuance who has recently attempted to enter the U.S. and North American markets, has suffered economic injury from Nuance's unfair and anticompetitive tactics and is entitled to injunctive relief and an award of treble damages.

### Background on ASR Technology and the Relevant Market

93. The technology relevant to Omilia NLS' counterclaims involves Automatic Speech Recognition, which is technology that allows a machine to recognize and respond to human voice commands, typically by converting speech to text. More specifically, the technology at issue concerns ASR software used in enterprise contact centers to automate the handling and routing of incoming calls. Such technology typically is deployed in high-end enterprise contact centers, which include, for example, contact centers with over 200 seats, where seats refer to the number of contact-center agents who handle incoming calls. High-end enterprise contact centers typically include large banks, telecom operators, large insurance companies, utilities, and other Fortune 500 companies, whose contact centers may handle as many as thousands of incoming calls or more a day. Enterprises with 200 seats or more have an economic incentive to invest in contact-center automation due to the high number of incoming calls such enterprises receive and the corresponding reduction in cost offered by call-automation solutions. Smaller businesses that receive fewer incoming calls from customers, and thus require smaller contact centers, do not have the same economic incentive to invest in contact-center automation due to, among other things, the relatively high start-up cost of investing in automation technology. As further explained below, the market for ASR

technology for use on-premises in large, high-end enterprise contract centers constitutes a distinct product market.

94.     ASR enterprise software typically comprises three core components:  (i) an ASR engine; (ii) a natural language understanding ("NLU") engine; and (iii) a dialogue manager ("DM").   The ASR engine is a software component that allows a computer to convert speech to text.  In the context of call center-automation, this text can be used within an interactive voice response ("IVR") application that enables a computer to respond to commands spoken via telephone.  The ASR engine itself comprises two key elements:  a decoder and training data.  The decoder is an algorithm that matches spoken sounds to data in two libraries, known as the Acoustic Model and the Language Model, respectively.  Training data is the data that populates the Acoustic and Language Models, which is acquired through heavily time-intensive analysis of real-life human speech for a given language.  As a general matter, a perfect decoder with poorly trained models will perform poorly as an ASR engine.  However, a mediocre decoder with well-trained models will perform adequately.  Thus, the availability of well-trained models for any given language is critical for an ASR engine to function well as to that language.

95.     Older forms of ASR technology employed a form of speech-enabled automation known as "directed dialogue," in which the system dictates to the caller what voice commands are acceptable, e.g., "If you would like to hear your account balance, please say 'balance.'"  As a result of recent advances in the field, ASR technology has come to include NLU, which is a form of technology that extracts meaning out of unstructured, free-form, spontaneous language such that callers can express themselves naturally without being limited to predefined commands dictated by the ASR system.

The NLU engine is a software component that processes text input received from the caller or text produced by the ASR engine and enables a computer to respond to speech expressed in natural language.  Finally, the DM receives the output of the NLU engine and determines how to respond to the caller, dynamically adapting to the caller's spoken request.

96.     The market for ASR technology for use on premises within high-end, large-scale enterprise contact centers (the "ASR Enterprise Software Market") constitutes a distinct product market characterized by high barriers to entry.  These include, among other things, the substantial investments of time and resources, including hundreds of thousands of hours or more of real-life training using large sets of data accumulated from large-scale contact centers, required to develop sufficiently robust Acoustic and Language Models for commercial ASR software to function effectively.  There is no substitute technology that provides to large-scale enterprise contact centers the same function and value with respect to call center automation as ASR Enterprise Software.  A hypothetical monopolist in the ASR Enterprise Software Market would be able to raise prices for its software profitably over competitive levels.

97.     Vendors that participate in the ASR Enterprise Software Market, including Nuance, contract either directly with their enterprise customers or indirectly through the use of intermediaries known as "resellers," who may resell the vendor's complete set of ASR Enterprise Software components or combine that vendor's ASR engine with the reseller's own proprietary NLU engine and/or DM.  Customers in the ASR Enterprise Market typically solicit bids from ASR Enterprise Software vendors through an RFP process that culminates in a license to the winning vendor's ASR Enterprise Software

that takes the form of a monthly subscription or a one-off perpetual license fee plus annual software maintenance fees in which the price of the license is based on the number of channels required by the customer's system. Customers separately pay additional pricing for professional services, such as technical assistance and system maintenance.

98.     As explained below, through its aggregation of patent assets and acquisition of actual and potential competitors, including nascent competitors, in the ASR Enterprise Software market, Nuance has established a dominant position in that market. Because of substantial barriers to entry, including but not limited to the time and investment required to acquire sufficient data to train the Acoustic and Language Models, for many languages across the world, the Nuance ASR engine is the only ASR engine that supports the language; as a result, Nuance Enterprise Software, or ASR Enterprise Software containing a Nuance ASR engine, is the only commercial option in countries where those languages are dominant. Because of the absence of meaningful competition, Nuance has been able to maintain high list license prices for its ASR Enterprise Software, which have effectively remained constant since launch, and to offer customers fewer discounts from list price than if it had been subject to legitimate competition, which has meant the net license price to Nuance software has increased over time. Meanwhile, Nuance has leveraged the fact that customers have few – or, for many languages, zero – ASR Enterprise Software options in order steadily to increase the price it charges customers for professional services beyond competitive levels. As a result, the total price paid by customers for Nuance software licenses and associated professional services (e.g., technical support) has, in the aggregate, increased to supra-competitive levels due

to the lack of competitive alternatives.

**Nuance's Acquisition of Monopoly Power Though the Aggregation of Patent Assets and Acquisitions of Competitors**

99.     At the heart of Nuance's anti-competitive scheme is a calculated strategy, executed over more than a decade, to acquire more than 50 of its actual or potential competitors as well as several hundred patents or more from unrelated parties.  A brief history of these acquisitions reveals how they have enabled Nuance to maintain a position of dominance in the market and to leverage that dominance to block innovative, competitive ASR technologies from entering and gaining a foothold in the market.

100.     Nuance, in its present form, was created in 2005 from a merger of ScanSoft and another entity also named Nuance ("Pre-2005 Nuance").   After the transaction, the combined entity was renamed "Nuance Communications, Inc."

101.     Pre-2005 Nuance focused on the commercialization of speech-recognition technology through call-center automation, launching its first commercial product in 1996.  At this time through to the early 2000s, Nuance had two principle competitors in the speech-recognition market:  Royal Philips Electronics Speech Processing Telephony and Voice Control, Dialogue Systems ("Philips") and SpeechWorks, Inc. ("SpeechWorks"), both of which were formidable innovators of ASR applications, and offered ASR-related solutions for call-center automation.  Upon information and belief, at this time, Pre-2005 Nuance, Philips and SpeechWorks collectively commanded a near-100% share of the market for speech-recognition technology designed for call-center automation for large enterprises.

102.     ScanSoft was formed in 1999 and focused primarily on desktop imaging software.   In December 2001, however, ScanSoft acquired Belgian-based speech

technology company Lernout & Hauspie following the latter's bankruptcy.  As a result of this acquisition, ScanSoft entered the speech-technology market and began to compete with Pre-2005 Nuance.  In January 2003, ScanSoft acquired Philips, which gave ScanSoft access to and ownership of substantial additional patents and technologies, as Philips had itself previously acquired other, smaller voice-recognition firms, including Voice Control Systems, Pure Speech, Scot Instruments and VPC, along with their intellectual property. A ScanSoft press release issued at the time described Philips as "a global leader in the field of speech processing, offering a full line of state-of-the-art products and technologies" and noted that the transaction gave ScanSoft "significant resources and market opportunities" to "leverage and expand its current global channel network," providing ScanSoft with a "roster of premier partners and customers."  Paul Ricci, ScanSoft's (and, later, Nuance's) CEO stated that he was "especially enthusiastic" that the transaction enabled ScanSoft to partner with Philips in, among other things, "*patent assertion*."  (October 7, 2002 press release (emphasis added)).

103.    Later, in August 2003, ScanSoft increased its sizeable ownership of voice-recognition patent assets, and substantially reduced the competitive playing field, by acquiring its other major competitor, SpeechWorks.  Media coverage at the time of the transaction described it as part of a "two-year strategy" by ScanSoft to "increase market share," and noted that this acquisition alone increased ScanSoft's intellectual property portfolio by some 200 patents.  ("ScanSoft, SpeechWorks agree to merge," EE Times, April 25, 2003).  Nuance acquired one of the patents asserted in this case, the '688 patent, through this transaction.

104.    Between January 2004 and May 2005, ScanSoft acquired six additional

actual and potential competitors:  LocusDialog, Telelogue, Inc., ART Advanced Recognitions Technologies, Ltd. ("ART"), Rhetorical Systems, Ltd., Phonetic Systems, Ltd., and MedRemote, Inc., further allowing it to amass additional patent assets, remove smaller players from the market, and expand ScanSoft's reach into other fields, such as automated medical transcription.

105.    Just prior to ScanSoft's merger with pre-2005 Nuance, the two companies were the only dominant providers of speech-recognition technology.  Not surprisingly, industry analysts and market participants expressed concern that the merger would impair competition.  For example, one commentator noted at the time that "the two companies have by far the largest market share" and expected that "[p]artners and end-users will . . . be concerned that licensing costs will increase without competition between the companies" and that the merger would "certainly eliminate competitive discounts between the companies."  ("The Impact of the ScanSoft-Nuance Merger," Speech Technology, May 1, 2005)

106.    After the 2005 merger, the newly formed Nuance continued at an alarming rate ScanSoft's strategy to acquire competitors and patent portfolios.  Between 2005 and 2018, Nuance entered into 49 publicly-announced transactions through which it acquired either a direct or potential competitor with most or all of its intellectual property assets, or a portfolio of patents from such an entity.  These included acquisitions of the following companies that developed and/or commercialized voice recognition-related technology that competed or potentially competed with Nuance:

| ACQUIRED ENTITY | YEAR |
| --- | --- |
| Dictaphone Corporation | 2006 |
| Mobile Voice Control | 2006 |

| ACQUIRED ENTITY | YEAR |
|---|---|
| Voice Signal Technologies ("Voice Signal") | 2007 |
| Vocada | 2007 |
| Philips Speech Recognition Systems GMBH ("Philips Speech") | 2008 |
| eScription | 2008 |
| Harman International Industries speech technology unit | 2009 |
| MacSpeech | 2010 |
| iTa P/L | 2010 |
| PerSay | 2010 |
| SVOX | 2011 |
| Loquendo | 2011 |
| Vlingo | 2011 |
| Transcend Services | 2012 |
| Cognition Technologies | 2013 |
| VoiceBox/Telisma | 2018 |

107.   Significantly, in 2008-2009, Nuance also acquired a portfolio of hundreds of voice-recognition related patents from IBM, including patents asserted in the instant lawsuit, as well as access to the source code of IBM's voice-recognition software.  These were followed by additional acquisitions of IBM patents in 2010 and 2013.  As a result of these transactions, Nuance ultimately acquired more than 900 patents from IBM.   In 2016, Nuance similarly acquired nearly 1,000 patents from AT&T.  Over the same time period, Nuance acquired more than 1,000 patents from other, smaller third-parties.

108.   Upon information and belief, Nuance does not practice the vast majority of the patents it acquired through these transactions.  On the contrary, the primary intent and purpose underpinning these transactions is to enable Nuance to use its vast, acquired patent portfolio to suppress innovation and prevent others from bringing to the market technologies that would compete with Nuance's ASR products.  Indeed, commenting specifically on Nuance's acquisitions of patent assets from IBM and others, noted speech

technology-industry expert Roberto Pieraccini stated:

> Unfortunately, the speech industry fell into the deplorable practice of 'patent trolling' – *acquiring patents for the sole purpose of suing smaller companies for infringement*.   The trollers would then force these companies either to pay large settlements, to exit the market, or to be acquired for a price well below their real valuation.[1]

As described below, this is exactly the strategy that Nuance has employed to secure its dominant position in the market.

109.   The foregoing corporate and intellectual property acquisitions ensured that Nuance has been able to maintain a market share well above 70% since 2001.   For example, a report published by leading industry analyst Gartner demonstrated that for the "speech recognition telephony server market," the combined market shares of the four leading vendors in 2002 – Nuance, SpeechWorks, ScanSoft and IBM – was approximately 77%, as reflected below:

Table 1
Top 10 Vendors' Speech Recognition Telephony Software by Ports and Systems — Worldwide, 2002

| | Ports | Systems | Ports Market Share | Systems Market Share |
|---|---|---|---|---|
| Nuance Communications | 35,379 | 221 | 36.0% | 27.2% |
| SpeechWorks* | 22,147 | 193 | 22.6% | 23.7% |
| ScanSoft* | 12,833 | 117 | 13.1% | 14.4% |
| IBM | 5,573 | 46 | 5.7% | 5.7% |
| Telisma | 4,695 | 29 | 4.8% | 3.6% |
| AT&T | 3,750 | 25 | 3.8% | 3.1% |
| Loquendo | 2,500 | 30 | 2.5% | 3.7% |
| InfoTalk | 1,155 | 11 | 1.2% | 1.4% |
| BBN Technologies | 950 | 2 | 1.0% | 0.2% |
| Vocalis** | 700 | 6 | 0.7% | 0.7% |
| Others | 8,525 | 133 | 8.7% | 16.4% |
| **Total** | **98,207** | **813** | **100.0%** | **100.0%** |

* ScanSoft acquired SpeechWorks on 11 August 2003
** Vocalis acquired by Netdecisions on 26 August 2003, majority shareholder in Fluency Voice Technology
Source: Gartner Dataquest (August 2003)

---

[1] Roberto Pieraccini, *The Voice in the Machine:  Building Computers That Understand Speech* (2012), Ch. 9, n. 19 (emphasis added).

110.    Ultimately, through its acquisition strategy, Nuance was able to acquire or control all of the relevant assets and intellectual property of its three largest competitors.  But it did not stop there; it also ultimately came to own or control smaller companies who represented a potential future competitive threat after 2002.  For example, the fifth largest vendor in 2002, Telisma, whose market share was only 4.8%, was later acquired by VoiceBox, which Nuance ultimately acquired in 2018.  Nuance also later acquired other competitors who had even smaller market shares in 2002 (e.g., Loquendo, with 2.5%) as well as AT&T and IBM patents and source code relating to speech recognition, which patents are among those asserted in the instant case.  By 2007, Nuance itself boasted that its share of the "market for speech-enabled call centers" was 75%, as reported in the Wall Street Journal.  ("Recognizing Nuance," Wall Street Journal, July 11, 2007.)  Other sources estimate that by 2010, Nuance controlled more than 80 percent of that market as a result of its acquisitions.[2]

111.    Today, Nuance claims that 85% of Fortune 100 companies use Nuance software and technology, while most other competitors in the ASR Enterprise Software Market individually maintain a mere fraction of that market share.  On information and belief, a speech automation industry analyst, recently undertook a study of the number of enterprise call center telephone ports that deploy ASR technology and concluded that the speech industry has one supplier (Nuance Communications) that provides over 80% of the speech recognition ports, and further noted that this dominance has led to a situation where there is no real competition in the base technology area and that the base

---

[2] Roberto Pieraccini, *The Voice in the Machine:  Building Computers That Understand Speech* (2012) at 260.

technology price is high and unlikely to decrease so long as this situation continues.

112.    Nuance also owns a patent portfolio comprising more than 5,300 patents at least 2,800 of which it purchased from third parties, making it the owner of one of the largest speech-recognition patent portfolios in the world.  Indeed, in its filings with the U.S. Securities and Exchange Commission, Nuance admits that "critical" to its ability to maintain its "market-leading position" are the thousands of patents and patent applications it has "purchased" or otherwise obtained.  (Nuance 2010 10-k Report)  And, in its recent publication, "Technology Trends 2019:  Artificial Intelligence," the World Intellectual Property Organization identifies Nuance as the most litigious patent litigation plaintiff in the world with respect to speech-processing technology.  As described further below, Nuance has executed its strategy to acquire actual and potential competitors through a calculated scheme of threatening to assert and/or actually asserting baseless patent infringement litigation using its massive portfolio of acquired patents to drive its competitors out of the market and/or coerce them into being acquired by Nuance.

113.    Nuance's extremely aggressive acquisition history has attracted considerable attention in the media.  For example, in a 2009 article entitled, "Don't Beat Your Competitors, Buy Them," CBS's Moneywatch[3] observed the following:

---

[3] Steve Tobak, "Don't Beat Your Competitors, Buy Them," CBS News, April 6, 2009, available at https://www.cbsnews.com/news/dont-beat-your-competitors-buy-them/, *last accessed* Nov. 7, 2019.

 Want to know how to beat your competitors? Buy them -- buy all of them, if you can pull it off without overleveraging, that is. That's been the strategy of **Nuance Communications** for more than a decade, and it's worked brilliantly.

Courtesy of dozens of mergers and acquisitions over the past 14 years, Nuance now owns much of the planet's speech technology. The company boasts a $3.2 billion market cap on annual sales of $868 million. It's never been profitable, but that appears to be by design. Its strategy is rapid growth through M&A, and the Nuance's history demonstrates nearly flawless execution:

*According to my math, the current incarnation of Nuance Communications is actually made up of about 43 companies.*
Nuance lists its competitors as **AT&T**, **IBM**, and **Microsoft**, which sounds formidable, but each of these giants competes with Nuance in specific, limited markets. Nuance is far and away the 800-pound gorilla of speech technology.

As for its business strategy, Nuance seems to have done a good job of focusing its limited resources on the largest vertical markets where it can optimize profit margins. That means avoiding the highly fragmented consumer electronics market with its thin margins and high support costs.

114.    As described above, Nuance continued this strategy well after 2009, further increasing its grip on the market and enabling it to further extract monopoly-level profits from the ASR Enterprise Market.   Industry commentators, including CBS Moneywatch, also point out that Nuance's acquisitions did not result in efficiencies and/or synergies that ultimately meant lower prices for its software.  To the contrary, with the reduction in competition, Nuance was able to maintain supra-competitive prices for its software, and was able to do so without innovating that software, which it would have been forced to do had it had been subject to legitimate competition.  For example, while

between 1994 and 2005, Pre-2005 Nuance introduced a major new release relating to its speech recognition software on average approximately once per year, since 2005, Nuance has issued only three new releases of its software – an average of approximately one new software release ever five years.  Nor, on information and belief, does Nuance practice the vast majority of speech automation-related innovations to which it has gained access through its purchases of competitors and/or patents.

115.    Nuance's acquisition strategy has also attracted the attention of U.S. antitrust regulators.  On information and belief, the Antitrust Division of the Department of Justice ("DOJ") has investigated or informally objected to at least two transactions involving Nuance.  In 2008, the DOJ launched an investigation as to whether Nuance's acquisition of Philips Speech created a monopoly in the medical transcription sector, which, on information and belief, was prompted in part due to complaints by smaller competitors regarding Nuance's history of acquisition and patent-assertion conduct.  Later, in 2009, the DOJ raised concerns about whether Nuance's proposed acquisition of Multimodal Technologies, Inc. ("MModal") would have substantially lessened competition in the market for "voice recognition engines."  (HSR Annual Report, Fiscal Year 2009, at 7, n.15).  Upon information and belief, Nuance abandoned the transaction because of the DOJ's concerns.  (Id.)

116.    Nuance's acquisitions of its competitors have been preceded by assertions of patent lawsuits, instituted without regard to the merits of the claims. that resulted in the defendant capitulating to Nuance's aggressive acquisition strategy.   As is evident from the publicly-available pleadings in those cases, Nuance and/or ScanSoft has engaged in a campaign to file patent infringement lawsuits in bad faith in order to (a) cause economic

harm to the named defendants, which typically are much smaller competitors of Nuance, by harming their business relationships and reputations, and causing them to incur significant legal expenses, and thereby (b) to exert improper leverage over those defendants as a prelude to acquiring them at a discounted price.

117.   For example, in 2004, ScanSoft commenced patent litigations against ART and Voice Signal, two speech-recognition technology competitors that Nuance would go on to acquire.  The filings in the ART case reveal that ScanSoft sued ART shortly after ART rejected an acquisition proposal by ScanSoft.  ART Advanced Recognition Techs., Inc.'s Opening Mem. of Law in Supp. of Its Mot. for Summ. J., *ScanSoft, Inc. v. Art Advanced Recognition Techns., Inc.*, No. 1:04-cv-10840 (D. Mass Aug 17, 2004), ECF No. 21 at 12.  Fewer than seven months after ScanSoft filed suit, ART capitulated and was acquired by the newly-formed Nuance.  ScanSoft engaged in the same conduct as to Voice Signal.  In 2004, ScanSoft offered to purchase Voice Signal.  Only days after Voice Signal rejected its offer, ScanSoft commenced an action in this Court accusing Voice Signal of infringing one of its voice-recognition related patents.  When Voice Signal rejected a subsequent acquisition proposal by the newly formed Nuance in 2006, Nuance filed another patent suit against Voice Signal, claiming that Voice Signal infringed three additional patents.  Nuance's strategy worked, as Voice Signal capitulated in 2007, just one year after Nuance commenced its second lawsuit.

118.   Similarly, prior to its acquisition of competitor Vlingo in 2011, Nuance sued Vlingo for patent infringement.  Upon information and belief, these lawsuits were commenced after Vlingo refused to acquiesce to a demand from Nuance's CEO to be acquired or be sued.  Indeed, as reported in the New York Times, Nuance's CEO

threatened Vlingo with the statement that, "I have patents that can prevent you from practicing in this market." ("The Patent Used As Sword," New York Times, October 7, 2012). Nuance ultimately filed multiple lawsuits against Vlingo, each of which it lost or settled. Although it was successful in deflecting Nuance's baseless patent infringement claims, upon information and belief, Vlingo ultimately succumbed and agreed to be acquired by Nuance because of the substantial revenues it expended in defending itself in those lawsuits. (*Id*.) Just prior to the acquisition, however, Vlingo filed its own lawsuit against Nuance alleging, among other things, that Nuance had improperly interfered with Vlingo's efforts to negotiate commercial agreements with Nokia and AT&T and had attempted to bribe three Vlingo executives by offering them $5 million each if they could convince their board of directors to sell Vlingo to Nuance.

119.   More recently, in 2017, after the DOJ had blocked its attempt to acquire MModal, Nuance sued MModal for patent infringement. In that litigation, MModal asserted counterclaims against Nuance, including counterclaims alleging that Nuance's claims of patent infringement were baseless and that, in connection with its prior offers to acquire MModal, Nuance threatened that if MModal did not agree to sell to Nuance, "Nuance would do what they do," that is, file a patent infringement lawsuit against MModal to pressure a sale. Def.'s Answer to Pl. Nuance Commc'ns, Inc.'s Compl. for Patent Infringement and Countercls., *Nuance Commc'ns, Inc. v. MModal LLC, et al.*, No. 1:17-cv-01484-UPA-MPT (D. Del. Dec. 11, 2017), ECF No. 22 at 30. MModal further alleged that, on the same day that Nuance filed its patent infringement lawsuit against MModal, Nuance initiated a campaign to inform MModal's customers that MModal infringed Nuance's patents in order to induce them to terminate their relationships with

MModal.   In December 2018, the District of Delaware denied Nuance's motion to dismiss MModal's counterclaims, which presently remain pending in the case.

120.   Since 2001, Nuance has commenced at least seventeen patent litigations worldwide against eight of its competitors, not including the present suit.   Only two of the seventeen cases went to trial, and in both instances a jury determined that Nuance's patents were invalid and/or not infringed.

**Nuance's Relationship With Omilia NLS and/or its Affiliates ("Omilia")
Prior to the Instant Lawsuit and its Efforts to Foreclose Omilia from
Competing in the Market**

121.   Omilia provides a proprietary ASR software system for use in large enterprise call centers.   As such, it is a direct competitor of Nuance in the ASR Enterprise Software Market.

122.   From 2007 until 2013, Omilia was a reseller of Nuance ASR technology, which it incorporated into call-center automation solutions using its own proprietary NLU engine and DM.

123.   In April 2010, while still a Nuance reseller, Omilia Managing Director Dimitris Vassos contacted Nuance's CEO, Paul Ricci, to propose that Omilia and Nuance explore the possibility of a commercial partnership beyond a reseller arrangement.   This outreach culminated in a meeting between Mr. Vassos and Peter MacKinnon, who at the time was General Manager of Nuance Europe, at Omilia offices in Athens in January 2011.   However, no commercial partnership, beyond the parties' then-existing reseller relationship, emerged from these efforts.   During Mr. Vassos's meeting with Mr. MacKinnon, and through related email exchanges, Mr. Vassos provided Nuance with documents that described Omilia proprietary DM and NLU system, known as DiaManT.

This is the same system that Nuance claims infringes the patents asserted in this case. The basic architecture and key features of DiaManT have not changed since Mr. Vassos's discussions with Nuance in 2010 and 2011.

124.   Subsequently, in 2012, after having obtained information regarding Omilia NLS' DiaManT system (as well as confidential information relating to the commercial success of DiaManT), Nuance forced Omilia to accept an amendment of its Reseller Agreement, which gave to Nuance sole approval authority as to any potential NLU projects, and effectively enabled Nuance to require Omilia to sell the full Nuance stack of software components and prevented Omilia from selling Omilia NLS' own NLU solution integrated with Nuance ASR.   Nuance further required Omilia to bundle Nuance professional services with its offerings to customers.   Upon information and belief, Nuance has implemented the same amendments with other resellers of Nuance software, thus further enabling it to leverage its dominant position in the market for ASR solutions in order to gain monopoly profits from the sale of professional services to customers.

125.   In October 2013, following Omilia NLS' continued success in European markets and elsewhere using its DiaManT system, Nuance required Omilia, under the pretense of a global partner review, to disclose its full list of customers and the projects on which Omilia was actively working.   Omilia disclosed the requested information to representatives of Nuance on October 9, 2013.   At the time, Nuance represented that it would maintain the customer list in confidence.   Immediately following this meeting, however, Nuance embarked on a systematic campaign to contact Omilia NLS' current and prospective customers to promote Nuance's products to them, thereby breaching its representation of confidentiality and interfering with Omilia NLS' existing and

prospective economic relationships with customers.

126.    Specifically, on October 10, 2013, one day after the disclosure described above, representatives from Nuance, together with representatives from VoiceWeb, a Nuance reseller and direct competitor of Omilia NLS in Greece, met with Omilia NLS' customer Piraeus Direct Services ("Piraeus") in Athens and, among other things, discussed confidential information pertaining to Omilia NLS' relationship with and provision of services to Piraeus.  On information and belief, VoiceWeb informed Piraeus that Nuance intended to terminate Omilia NLS' Reseller contract and that, accordingly, Omilia would no longer be able to provide Nuance software to Piraeus as part of an Omilia NLU solution.

127.    Nuance also contacted Omilia partner Incom and informed it that Nuance was aware of three potential NLU-related projects in the Ukraine for Privat Bank, MTS Ukraine and Alfa Bank.  Each of these projects were identified in the information that Omilia had disclosed to Nuance, in confidence, on October 9, 2013.  Upon information and belief, Nuance urged Incom to compete for the business with an all-Nuance solution rather than an Omilia NLU solution.

128.    On October 31, 2013, Nuance formally served Omilia with a 90-day notice to terminate the Reseller Agreement.  Nuance did not provide Omilia with its rationale for terminating the Reseller Agreement.  Upon information and belief, the primary reason for Nuance's termination was to impair Omilia NLS' ability to compete with Nuance using Omilia NLS' proprietary NLU solution, which was otherwise not prohibited by the Reseller Agreement.  After termination of the Reseller Agreement, Omilia ceased using the Nuance ASR in its systems and instead implemented a

proprietary Omilia NLS ASR in its NLU solutions.  Omilia NLS was able to develop an ASR through its years of experience in the ASR Enterprise Software Market, which included developing the acoustic and language models required to power its own ASR software component.

129.   Upon information and belief, on November 18, 2013, prior to the expiry of the 90-day notice of termination period, Nuance contacted Omilia customer ENEL Romania ("ENEL") and informed it that Nuance intended to terminate its Reseller Agreement with Omilia and that Omilia would no longer be able to provide Nuance software to ENEL Romania as part of an NLU solution.  Upon information and belief, as a result of this communication, ENEL elected not to continue its relationship with Omilia.

130.   On January 19, 2018, long after the termination of the Reseller Agreement, Nuance's legal counsel sent a letter to Omilia demanding that it submit to an audit in respect of every transaction with and/or royalty payment it had received from any of its customer since the inception of the Reseller Agreement.  Because there was no support for such an audit in the Reseller Agreement or other agreements between Nuance and Omilia, Omilia refused.  Upon information and belief, Nuance's demand was objectively baseless and made in bad faith for the sole purpose of gathering confidential information regarding Omilia NLS' customers that Nuance could exploit to harm Omilia NLS' business relationships and prevent Omilia from competing with Nuance.

131.   On September 26, 2018, more than seven years after Mr. Vassos had provided to Nuance information about the DiaManT system, Nuance sent Omilia a letter asserting that Omilia NLS' systems infringe certain patents owned or licensed by

Nuance, specifically, U.S. Patent Nos. 6,662,157 (the "'157 patent"), 8,532,993, 7,505,905, and 8,379,804.  Nuance does not assert the '157 patent in this case.  In its September 26, 2018 letter, Nuance did not identify the '925, '839, '534, '532 or '688 patents, which it now claims Omilia NLS infringes.  According to assignment information recorded at the U.S. Patent and Trademark Office, Nuance executed the assignments for three of the patents it asserts here, the '804, '534 and '993 patents, on March 29, 2013, March 29, 2013, and December 14, 2016, respectively, after 2010, when Mr. Vassos provided Nuance with detailed information regarding the Omilia systems.

132.    On information and belief, before it sent Omilia the September 26, 2018 letter, and several months before it commenced the instant lawsuit, Nuance represented to Omilia NLS' customers and/or potential customers and resellers in the U.S. and Canada, including Connex, a reseller of Omilia products, and potential customers that it had brought a lawsuit against Omilia because the DiaManT system infringes certain of Nuance's U.S. patents.  On information and belief, Nuance further suggested that those potential customers and resellers should not utilize the Omilia solution because it allegedly infringes Nuance-owned patents and offered to Omilia NLS' resellers the lure of additional business from Nuance, including in the form of downstream customers, if they agreed to drop Omilia as a supplier.

133.    On information and belief, prior to the commencement of this lawsuit, Omilia lost several commercial opportunities in the United States and North America, including potential customers and commercial partners, as a result of Nuance's representation that Omilia infringes Nuance patents. Those allegations, as explained below, are objectively baseless.  Moreover, its representation that Nuance had sued

Omilia for patent infringement in the U.S. was false at the time.  On information and belief, Nuance's false and defamatory representations have resulted in the loss to Omilia of hundreds of millions of dollars of potential revenue from the use of Omilia NLS' systems in the United States and/or North America.  For example, Omilia NLS entered into a confidential development agreement to provide development services to a company headquartered in the Chicago area. On information and belief, Nuance's baseless representations of patent infringement and the filing of this lawsuit caused this customer to elect to terminate entirely its relationship with Omilia, which alone has resulted in a loss to Omilia of millions of dollars of future annual revenue.

134.    Nuance's false and objectively baseless representations, which were filed without regard to the merits or the patens or the claim of patent infringement, have also harmed Omilia NLS' relations with existing customers.  Among other things, as a direct result of Nuance's representations, Omilia NLS was forced to offer existing customers lower prices than it otherwise would have due to its customers' vendor risk management policies and the risk management-related provisions in Omilia NLS' agreements with its customers.  Such price discounts have ranged from 50% to as much as 70%, and have amounted to an overall loss to Omilia NLS of at least several million dollars or more.  In the aggregate, Nuance's unfair and anticompetitive conduct has caused Omilia NLS to suffer economic injury in the form of hundreds of millions of dollars or more of lost profits and, on information and belief, has been intended to drive Omilia NLS out of the ASR Enterprise Software Market.

### Nuance's Objectively Baseless Assertion of Patent Infringement Claims in the Instant Lawsuit

135.    Upon information and belief, prior to the filing of this lawsuit, Nuance

61

knew or should have known, based on information provided by Mr. Vassos to Nuance in 2010-11, as well as from publicly-available information describing the Omilia systems, that the accused Omilia NLS systems do not infringe the asserted patents.

136.   For example, the materials that Mr. Vassos provided to Nuance in 2011 indicate that the accused DiaManT system does not infringe the '839 and '534 patents. Among other things, the '839 patent requires that a system perform the steps of (i) converting text-based user interactions into a format consumable by a voice server and (ii) converting output from the voice server into text format.  The materials provided to Nuance show that DiaManT is not a voice server, and that it is "channel independent," meaning that it does not perform the conversion steps claimed by the '839 patent.  Those materials also indicate that DiaManT does not use media files with metadata containers that include speech prompts related to content stored in the media file, as claimed in the '534 patent.

137.   Similarly, publicly-available materials relating to Omilia NLS' systems (see, e.g., https://omilia.com/technology/ ) to which Nuance had access prior to filing this action indicate that those systems do not use "adaptation algorithms" "without supervision," as required by the '905 patent, or adapt their implemented acoustic models by using "domain-specific" data, as required by the '925.  Rather, in Omilia NLS' systems, the language models are manually trained and re-trained by human linguists.

138.   The same source indicates that Omilia NLS' proprietary ASR system performs speech recognition through the use of a single custom-trained language model, which may include words from different languages, but it does not use speech-recognition results from a plurality of languages, as required by the claims of the '532

patent, or determine a common set of features for subword units in two languages, as claimed in the '688 patent.

139.    Finally, each asserted claim of the '993 patent requires that the accused system perform the step of "incorporating the pronunciation probabilities into the language model."  Publicly available materials describing the Omilia system, including but not limited to a 2018 paper published by Omilia engineers (available at https://omilia.com/site-assets/mizera2018.pdf), show that the ASR platform used in Omilia NLS' NLU system addresses pronunciation variability without incorporating pronunciation probabilities into the ASR's language model.

140.    Prior to the filing of this lawsuit, Nuance also knew or should have known that the asserted patents are invalid.  For example, as alleged above at paragraphs 55 to 59, the claims of the '804 patent are invalid in view of, among other things, the following prior art:  the Paterik reference, and VoiceXML 2.0 and CCXML, both of which are open industry standards, and references describing IBM's WebSphere software.   Upon information and belief, Nuance was aware of the relevant prior art when it asserted the '804 patent.  For example, Nuance has been on the board of the VoiceXML Forum, the organization responsible for setting the VoiceXML standard, since 2011, at which time its platform was among the first to achieve certification under the VoiceXML 2.1 standard.  Similarly, Nuance has had access to the source code of IBM's WebSphere since 2009, when it also acquire IBM patents relating to voice-recognition technology. Finally, Nuance was aware of the Paterik reference by at least 2014, as it was cited by the examiner during the prosecution of U.S. Patent No. 8,768,711 (the "'711 patent"), assigned to Nuance, and listed on the face of the '711 patent, which issued on July 1,

2014.  As such, Nuance knew or should have been aware of the invalidating prior art when it asserted the '804 patent in this case.

## COUNT 17

### (Monopolization in Violation of Section 2 of the Sherman Act)

141.   Omilia NLS repeats and re-alleges paragraphs 1 through 140 of these counterclaims as if fully set forth herein.

142.   This claim arises under Section 2 of the Sherman Act, 15 U.S.C. § 2 and under the Clayton Act, 15 U.S.C. §§ 15 and 26.

143.   The relevant product market for the following counterclaims is the ASR Enterprise Software Market.

144.   The relevant geographic market is the United States.

145.   Nuance has been a dominant vendor in the ASR Enterprise Software Market for over 20 years and possesses monopoly and market power in that market. Direct evidence of Nuance's market power includes evidence of Nuance's ability to raise beyond competitive levels the license fee of its ASR Enterprise Software and/or associated professional services fees.  Nuance's market power is also established through circumstantial evidence, including Nuance's share of the relevant market, which has ranged from 60% to as much as 85% over the past twenty years.  Because acquiring the data required to train an ASR system for a language is an extremely expensive and time-consuming process, there are massive barriers to entry for any potentially new entrants to the ASR Enterprise Software Market who might offer a competitive alternative to Nuance ASR technology.  Indeed, Nuance's own Annual Report states "[o]ur technologies are based on complex algorithms that require extensive amounts of acoustic and language

models, and recognition and understanding techniques. *A significant investment in capital and time would be necessary to replicate our current capabilities*." Nuance Communications, Inc., Annual Report (Form 10-K) (Nov. 26, 2019) (emphasis added). Nuance's scheme has exploited such barriers to entry and ensured that Nuance commands monopoly power in the ASR Enterprise Software Market.

146.    As alleged herein, Nuance's anti-competitive scheme has included more than 50 acquisitions of competitors or potential competitors as well as thousands of patents or more from unrelated third parties.

147.    Nuance's scheme to acquire and exclude competitors through, among other things, threats and intimidation, and to amass thousands of patents that were not the result of Nuance research, development or innovation, constitutes a willful acquisition of monopoly power that harms competition and reduces innovation. Nuance's scheme includes a specific intent to monopolize the relevant market and harm competition.  On information and belief, this pattern of knowing anticompetitive behavior continues with Nuance's objectively baseless assertion of its purported patent rights against Omilia NLS in the instant action.

148.    Nuance's abuse of its market power and specific intent to monopolize is further evidenced by its interactions with Omilia NLS, which has included, among other things, conduct intended to pressure Omilia NLS out of, or otherwise prevent it from gaining market share in, the ASR Enterprise Software Market, which is furthered by its objectively baseless claims of patent infringement in this case.

149.    Nuance's continued actions, including this suit, has caused Omilia NLS to suffer antitrust injury by harming it in its business and property, including by irreparably

harming Omilia NLS' relations with its existing and potential customers and resellers, foreclosing Omilia NLS from entering the ASR Enterprise Software Market, and causing it to expend substantial resources to defend itself in the patent lawsuit, which likely far exceed its current revenues.

150.    There are no procompetitive justifications for Nuance's conduct and/or the anticompetitive effects of Nuance's conduct far outweigh any putative procompetitive justification.

151.    Omilia NLS is entitled to a judgment from this Court for all damages incurred by Nuance's antitrust violations, including treble damages.  Omilia NLS is also entitled to injunctive relief requiring Nuance refrain from its continued anticompetitive conduct, including any further assertion of baseless patent infringement claims against Omilia NLS and/or interference with Omilia NLS' relationships with existing or potential customers and resellers.

## COUNT 18

### (Violation of Section 7 of the Clayton Act)

152.    Omilia NLS incorporates by reference paragraphs 1 through 151 of these counterclaims as if fully set forth herein.

153.    Section 7 of the Clayton Act provides that "[n]o person . . . shall acquire . . . assets . . . where . . . the effect of such acquisition . . . may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.

154.    Through its acquisitions of competitors and patent assets, Nuance has obtained a monopoly in the ASR Enterprise Software Market.

155.    Using patent and other assets it has acquired through acquisitions, Nuance

has engaged in conduct, including the assertion of baseless patent infringement lawsuits and defamatory representations to customers of actual and potential competitors, including Omilia NLS that has had the effect of substantially lessening competition in the ASR Enterprise Software Market.

156.    Nuance's conduct as alleged above has directly and proximately impeded Omilia NLS from competing in the ASR Enterprise Software Market and has caused Omilia NLS to lose customers and potential customers, all to the damage of Omilia NLS' business and property.

## COUNT 19

### (Common Law Unfair Competition)

157.    Omilia NLS repeats and re-alleges paragraphs 1 through 156 of these counterclaims as if fully set forth herein.

158.    Nuance's conduct described above, including but not limited to its disparagement of Omilia NLS through unfounded accusations and false representations of patent infringement disseminated to Omilia NLS' existing and potential customers and resellers, and in the marketplace more generally, constitute acts of unfair competition that have interfered with or threaten to interfere with Omilia NLS' ability to conduct its business, including its ability to establish or maintain its customer and reseller relationships, and has caused Omilia NLS to suffer damages, including attorneys' fees and expenses incurred in defending and asserting counterclaims in this action.

## COUNT 20

### (Tortious Interference with Contractual Relations)

159.    Omilia NLS repeats and re-alleges paragraphs 1 through 158 of these

counterclaims as if fully set forth herein.

160.    As alleged above, Omilia NLS entered into valid contractual relationships with Connex and other customers and resellers.

161.    With full knowledge of the existence of those contracts, Nuance intentionally informed Connex, other resellers and Omilia NLS customers of the instant lawsuit.  On information and belief, Nuance informed Connex, other resellers and Omilia NLS customers of the lawsuit in an effort to induce them to breach their contractual obligations and instead contract with Nuance to perform the services under the contracts.

162.    Nuance's actions and conduct in attempting to induce Connex, other resellers and Omilia NLS customers to breach their contracts with Omilia NLS were improper in motive and means, including but not limited to, Nuance's misrepresentation that Nuance had filed suit against Omilia NLS for patent infringement and that Omilia NLS' products infringe Nuance's patents, when in fact the lawsuit had not yet been filed and Nuance's claims of infringement are objectively baseless.

163.    As a direct and proximate result of Nuance's actions, Omilia NLS suffered substantial economic damages as alleged above.

## COUNT 20

### (Tortious Interference with Advantageous Business Relations)

164.    Omilia NLS repeats and re-alleges paragraphs 1 through 163 of these counterclaims as if fully set forth herein.

165.    Omilia NLS has an advantageous business relationship with TD Bank such that Omilia NLS and TD Bank are in active negotiations to deploy Omilia NLS' technology in TD Bank's services.  The negotiations have progressed such that a draft

contract is in review.

166.     On information and belief, Nuance had full knowledge of Omilia NLS' negotiations with TD Bank.  Nuance informed TD Bank of the instant lawsuit in an effort to induce TD Bank to forgo a contract with Omilia NLS and instead contract with Nuance.

167.     Nuance's actions and conduct in attempting to induce TD Bank to contract with Nuance was improper in motive and means, including but not limited to, the fact that Nuance's actions were an attempt to harm Omilia NLS financially such that Nuance may foreclose Omilia NLS from the US and Canada Markets.

168.     As a direct and proximate result of Nuance's actions, Omilia NLS suffered substantial economic damages as alleged above.

## **PRAYER FOR RELIEF**

WHEREFORE, Omilia NLS prays for judgment as follows:

A.     Dismissal of the Complaint in its entirety with prejudice;

B.     Denial of all relief sought by Plaintiff and Counterclaim-Defendant Nuance;

C.     A declaration that Omilia NLS has not infringed and does not infringe any valid and enforceable claim of the '905 Patent, the '993 Patent, the '839 Patent, the '534 Patent, the '804 Patent, the '532 Patent, the '688 Patent, and/or the '925 Patent;

D.      A declaration that the '905 Patent, the '993 Patent, the '839 Patent, the

'534 Patent, the '804 Patent, the '532 Patent, the '688 Patent, or the '925

Patent are invalid and unenforceable.

E.      An entry of judgment against Nuance under Sherman Act § 2, including

an award to Omilia NLS of treble damages attributable to Nuance's

antitrust violations;

F.      An injunction ordering Nuance to cease its unlawful anticompetitive and

exclusionary conduct;

G.      An award of reasonable attorney's fees, costs, and expenses incurred by

Omilia NLS in this action as the prevailing party; and

H.      Such other and further relief as this Court may deem just and proper.


## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Omilia NLS requests

a trial by jury of any issues so triable.



Dated:  November 27, 2019

                                        Respectfully Submitted,



                                        __/s/ Kevin C. Adam_____

                                        Kevin C. Adam (SBN 684955)
                                        WHITE & CASE LLP
                                        75 State Street, 24th floor
                                        Boston, MA 02109
                                        (617) 979-9300

70

Dimitrios Drivas (*pro hac vice pending*)
Raj Gandesha (*pro hac vice*)
Leon Miniovich (*pro hac vice pending*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020-1095
(212) 819-8286

Hallie Kiernan (*pro hac vice*)
WHITE & CASE LLP
3000 El Camino Real
Two Palo Alto Square, Suite 900
Palo Alto, CA  94306
(650) 213-0300

*Counsel for Omilia Natural Language*
*Solutions, Ltd*

## CERTIFICATE OF SERVICE

I hereby certify that counsel of record who are deemed to have consented to electronic service are being served on November 27, 2019, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5.4 (c).  Any other counsel of record will be served by First Class U.S. Mail on this same date.

/s/ Kevin C. Adam

Kevin C. Adam