**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NUANCE COMMUNICATIONS, INC. | Civil Action No. 1:19-CV-11438-PBS |
| Plaintiff and Counterclaim Defendant, | **Leave to File Granted on Mar. 10, 2020, ECF No. 77** |
| v. | *Electronically Filed* |
| OMILIA NATURAL LANGUAGE SOLUTIONS, LTD. | |
| Defendant and Counterclaim Plaintiff. | |

## COPY OF OMILIA'S NEW CANADIAN COMPETITION SUIT AGAINST NUANCE

Dated: March 10, 2020

Respectfully submitted,

By: */s/ Eric S. Hochstadt*

**WEIL, GOTSHAL & MANGES LLP**

David J. Lender (admitted *pro hac vice*)
767 Fifth Avenue
New York, NY 10153
(212) 310-8153
david.lender@weil.com

Eric S. Hochstadt (admitted *pro hac vice*)
767 Fifth Avenue
New York, NY 10153
(212) 310-8583
eric.hochstadt@weil.com

**WOMBLE BOND DICKINSON (US) LLP**

Jennifer Itzkoff (MA BBO No. 675694)
Independence Warf
470 Atlantic Avenue, Suite 600
Boston, MA 02110
(857) 287-3142
jennifer.itzkoff@wbd-us.com

Christian E. Mammen (admitted *pro hac vice*)
1841 Page Mill Road, Suite 200
Palo Alto, CA 94304
(408) 341-3067
chris.mammen@wbd-us.com

Carrie Richey (admitted *pro hac vice*)
1841 Page Mill Road, Suite 200
Palo Alto, CA 94304
(408) 341-3060
carrie.richey@wbd-us.com

Christine H. Dupriest (admitted *pro hac vice*)
271 17th Street, Suite 2400
Atlanta, GA 30363
(404) 962-7538
christine.dupriest@wbd-us.com

Kristin Lamb (admitted *pro hac vice*)
811 Main Street, Suite 3130

Houston, TX 77002
(346) 998-7843
kristin.lamb@wbd-us.com

**NUANCE COMMUNICATIONS, INC.**

David Greenbaum (admitted *pro hac vice*)
1111 Macarthur Boulevard
Mahwah, NJ 07430
(857) 214-5524
david.greenbaum@nuance.com

*Counsel for Plaintiff and Counterclaim*
*Defendant Nuance Communications, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 10th day of March 2020, I electronically filed the foregoing

**COPY OF OMILIA'S NEW CANADIAN COMPETITION SUIT AGAINST NUANCE** with

the Clerk of Court using the CM/ECF system which will send notification of such filing to all

attorneys of record in this case.

*/s/ Eric S. Hochstadt*
Eric S. Hochstadt

 CT Corporation

**Service of Process Transmittal**
03/06/2020
CT Log Number 537336049

**TO:**   David Greenbaum
Nuance Communications, Inc.
1 Wayside Rd
Burlington, MA 01803-4609

**RE:**   **Process Served in Massachusetts**

**FOR:**   Nuance Communications, Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | OMILIA NATURAL LANGUAGE SOLUTIONS. LTD. PLTF. vs. NUANCE COMMUNICATIONS INC and NUANCE COMMUNICATIONS CANADA. INC., DFTS. |
| **DOCUMENT(S) SERVED:** | Statement, Attachments |
| **COURT/AGENCY:** | None Specified<br>Case # CV2000637435000 |
| **NATURE OF ACTION:** | Statement of Claim |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Boston, MA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 03/06/2020 at 13:19 |
| **JURISDICTION SERVED :** | Massachusetts |
| **APPEARANCE OR ANSWER DUE:** | Within 20 after this statement of claim is served on you |
| **ATTORNEY(S) / SENDER(S):** | McCarthy Tetrault LLP<br>Suite 5300, Toronto Dominion Bank Tower<br>Toronto, ON M5K1E6<br>416-601-823 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 03/06/2020, Expected Purge Date: 03/11/2020<br><br>Image SOP<br><br>Email Notification,  David Greenbaum  david.greenbaum@nuance.com<br><br>Email Notification,  KATIE MARBLE  kathryn.marble@nuance.com<br><br>Email Notification,  Jackie Reppucci  Jacquelyn.Reppucci@nuance.com |
| **SIGNED:**<br>**ADDRESS:** | C T Corporation System<br>1209 N Orange St<br>Wilmington, DE 19801-1120 |
| **For Questions:** | 866-401-8252<br>EastTeam2@wolterskluwer.com |

Page 1 of  1 / CJ

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

*W) 20 00 637c/35 000*

Court File No.:

### ONTARIO
### SUPERIOR COURT OF JUSTICE

**B E T W E E N :**



OMILIA NATURAL LANGUAGE SOLUTIONS, LTD.

**Plaintiff**

- and -

NUANCE COMMUNICATIONS, INC. and  *C/o CT(w)rp*
NUANCE COMMUNICATIONS CANADA, INC.

**Defendants**

### STATEMENT OF CLAIM

**TO THE DEFENDANTS:**

A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU by the plaintiff.  The claim made against you is set out in the following pages.

IF YOU WISH TO DEFEND THIS PROCEEDING, you or an Ontario lawyer acting for you must prepare a statement of defence in Form 18A prescribed by the *Rules of Civil Procedure*, serve it on the plaintiff's lawyer or, where the plaintiff does not have a lawyer, serve it on the plaintiff, and file it, with proof of service, in this court office, WITHIN TWENTY DAYS after this statement of claim is served on you, if you are served in Ontario.

If you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your statement of defence is forty days.  If you are served outside Canada and the United States of America, the period is sixty days.

Instead of serving and filing a statement of defence, you may serve and file a notice of intent to defend in Form 18B prescribed by the *Rules of Civil Procedure*.  This will entitle you to ten more days within which to serve and file your statement of defence.

IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU. IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

TAKE NOTICE: THIS ACTION WILL AUTOMATICALLY BE DISMISSED if it has not been set down for trial or terminated by any means within five years after the action was commenced unless otherwise ordered by the court.

A True Copy Attest

3/6/20

Constable, Boston, MA      Date

- 2 -

Date:   March 4ᵗᵗᵘ, 2020                    Issued by _____
                                                        Local registrar
                                            Address of   393 University Avenue
                                            court office  Toronto ON  M5G-1E6

TO:     NUANCE COMMUNICATIONS, INC.         SUPERIOR COURT        COUR SUPÉRIEURE
        One Wayside Road                    OF JUSTICE            DE JUSTICE
        Burlington MA  01803      C/O Ct    330 UNIVERSITY AVE.   330 AVE. UNIVERSITY
        United States of America   Corp     8TH FLOOR             8E ÉTAGE
                                            TORONTO, ONTARIO      TORONTO, ONTARIO
                                            M5G 1R7               M5G 1R7

AND TO:  NUANCE COMMUNICATIONS CANADA, INC.
         1500 Robert-Bourassa Boulevard
         Suite 935
         Montreal QC  H3A 3S7

## CLAIM

1.      Omilia Natural Language Solutions Ltd. ("**Omilia**") claims against the defendants, Nuance Communications Canada, Inc. ("**Nuance Canada**") and Nuance Communications, Inc. ("**Nuance**") for:

(a)     Damages in the amount of $33,217,530 for injurious falsehood, defamation, breach of Section 52(1) of the *Competition Act*, R.S.C. 1985, c. C-34 ("*Competition Act*"), intentional interference with economic relations, unjust enrichment, and waiver of tort;

(b)     An order and declaration that Nuance and Nuance Canada be disgorged of any and all monies received as a consequence of any wrongdoing perpetrated by them upon Omilia;

(c)     A declaration that all monies obtained by Nuance and Nuance Canada as a result of their wrongful conduct are held in constructive trust in favour of Omilia;

(d)     Such orders and declarations, injunctive or otherwise, interim, interlocutory and permanent, to preserve, trace, and locate all monies and assets which form the constructive trust referred to above;

(e)     Punitive damages in the amount of $1,000,000;

(f)     Pre-judgment and post-judgment interest in accordance with the *Courts of Justice Act*, R.S.O. 1990, c. C.43, as amended;

(g)     Costs of this proceeding on a full indemnity scale;

(h)     Investigative costs on a full indemnity basis pursuant to section 36 of the *Competition Act*, R.S.C. 1985, c. C-34; and

(i)     Such further and other relief as this Honourable Court deems just.

## OVERVIEW

2.      Omilia is a growing customer service technology company. Its customers are business enterprises with a need to facilitate communications with customers in high volume. Omilia offers its customers a suite of technology offerings that enable them to provide their own customers with a unified platform for conversational customer service through multiple forms of communication media. This is known as an omni-channel approach.

3.      Omilia's suite of products includes an artificial intelligence self-service solution, which allows businesses to offer their customers a high quality, conversational, human-to-machine customer service experience. This solution is based on Omilia's proprietary automated speech recognition ("ASR") technology.

4.      Nuance is one of the largest customer service technology companies in North America. Nuance Canada is a Canadian affiliate of Nuance. Nuance and Nuance Canada also offer omni-channel solutions with their own ASR technology. While in recent years Nuance appears to have taken some cues from Omilia's technology in the development of its own products, Omilia's ASR technology is functionally superior to Nuance's.

5.      Since 2001, Nuance has carried out a scheme to eliminate or acquire rival ASR technology providers in the United States. As a result, Nuance has effectively eliminated meaningful competition in the large scale enterprise ASR market in the United States. One of Nuance's tactics has been to acquire patents relating to ASR and then to threaten or commence patent lawsuits against smaller competitors to drive them out of business or force capitulation to acquisition.

6.      Another tactic employed by Nuance in the United States has been to contact its competitors' clients and resellers with injurious and defamatory statements about Nuance's competitors, aimed at discouraging those parties from doing business with Nuance's competitors, and inducing them to switch to Nuance as their supplier. Nuance is in the process of carrying out these tactics against Omilia in the United States, which is the subject of legal proceedings in that jurisdiction.

7.      Nuance Canada, with the help of Nuance, has recently commenced these unlawful tactics against Omilia in Canada.

8.      In or about November 2019, representatives of Nuance Canada approached representatives of the Toronto-Dominion Bank ("**TD Bank**") and made false and injurious statements about Omilia designed to cause TD Bank to withdraw from a project it would have otherwise completed for the implementation of Omilia technology solutions by TD's insurance business in Canada ("**TD Insurance**"). The project was a pilot. If the pilot went as expected, TD Bank was likely to roll out Omilia's technology solutions across TD Bank's other business lines as well. As a direct result of having been misled and misinformed by Nuance Canada, TD Bank halted the project and has declined to enter into further formalized arrangements for the use of Omilia technology. Omilia has lost both the project with TD Insurance and the further opportunities with TD Bank from which it otherwise stood to profit. This has, in turn, damaged Omilia's efforts to make inroads into the Canadian ASR technology market.

9.      Omilia has suffered damage as a result of Nuance Canada's wrongful conduct in Ontario. The full extent and impact of Nuance Canada's conduct in Ontario and Omilia's corresponding damages may not yet be known.

**FACTUAL BACKGROUND**

**THE PARTIES**

10.     The plaintiff, Omilia, is a growing customer service technology company, incorporated under the laws of Cyprus. Omilia has developed a suite of customer service products that enable its business enterprise customers to provide their own customers with a single unified platform for conversational customer service through multiple media (e.g. phone call, mobile app, web chart, SMS text, etc.). This is called the "omni-channel approach" to customer service.

11.     Based on its proprietary ASR technology, Omilia has developed an artificial intelligence self-service solution, which allows its customers to offer their customers a high quality, conversational, human-to-machine customer experience. Omilia's principal customers are large banks, telecommunications companies, insurance companies, utilities, and other companies with a need to manage and respond to large volumes of customer service communications.

12.     As discussed further below, after enjoying success in Europe and a breakout in Canada, Omilia has recently been taking steps to expand its business in Canada and the United States.

13.     The defendant Nuance is a multi-billion dollar conglomerate built by more than a decade of predatory acquisitions of competitors, patent assets, and competing technologies intended to ensure that Nuance, and Nuance technology, maintain a dominant position in North American markets. Nuance Canada is the main Canadian subsidiary of Nuance.

14.     Nuance is incorporated under the laws of Delaware, United States. Nuance Canada is incorporated under the laws of Québec, Canada.

15.     Nuance and Nuance Canada conduct business in the province of Ontario.

**Background on ASR Technology**

16.     ASR technology enables a machine to recognize and respond to human voice commands. Omilia, Nuance, and some of their competitors have their own proprietary ASR technology that is used in enterprise customer care centres to automate the handling and routing of incoming calls. ASR technology is typically deployed in high-end enterprise customer care centres for large companies, which may handle as many as thousands of incoming calls per day or more.

17.     ASR enterprise software is typically comprised of three core components: (i) an ASR engine; (ii) a natural language understanding ("NLU") engine; and (iii) a dialogue manager ("DM"). The **ASR engine** allows a computer to convert speech to text. The **NLU engine** processes the text produced by the ASR engine and enables a computer to respond to speech expressed in natural language. An NLU engine can extract meaning out of unstructured, free-form, spontaneous language such that callers can express themselves naturally without being limited to predefined commands dictated by the ASR system (as older forms of ASR technology required). The **DM** receives the output of the NLU engine and determines how to respond to the caller, dynamically adapting to the caller's spoken request.

18.     Omilia's proprietary DM and NLU system is called "DiaManT" (Dialogue Management Technology).

19.     The market for ASR technology for use within high-end, large-scale enterprise customer care centres constitutes a distinct product market characterized by high barriers to entry. These include, among other things, the substantial investment of time and resources, including hundreds of thousands of hours or more of real-life training using data acquired from large scale customer care centres, which are required to develop sufficiently robust acoustic and language models for commercial ASR enterprise software to function effectively.

20.     Vendors that participate in the large scale ASR enterprise software market, including Nuance and Omilia, contract either directly with their enterprise customers or indirectly through the use of intermediaries known as "resellers," who may resell the vendor's complete set of ASR enterprise software components, or combine parts of that vendor's ASR technology with parts of their own technology. For example, a reseller may contract with an ASR technology company to combine that company's ASR engine with their own NLU and DM.

21.     As explained below, through its aggregation of patent assets and actual and potential competitors in the ASR enterprise software market, Nuance has established a dominant position in this market in the United States.

**Nuance Acquired Monopoly Power Though the Aggregation of Patent Assets and Acquisitions of Competitors**

22.     Since the early 2000s, Nuance has carried out a calculated strategy to acquire actual or potential competitors, as well as a huge library of thousands of patents from unrelated parties. Over more than a decade, Nuance has acquired more than 50 of their actual or potential competitors. These acquisitions have enabled Nuance to maintain a position of dominance in the ASR enterprise software market in the United States and in other countries.

23.     Today, Nuance claims that 85% of Fortune 100 companies use Nuance software and technology in the United States, while most other competitors in the ASR enterprise software market individually maintain a mere fraction of that market share in the United States.

24.     Nuance does not practice the vast majority of the patents it has acquired through these transactions. On the contrary, the primary purpose underpinning these transactions is to enable Nuance to use their vast, acquired patent portfolio to suppress innovation and prevent market entry by its competitors. In its filings with the United States Securities and Exchange Commission, Nuance admits that the thousands of patents and patent applications it has "purchased" or otherwise obtained are "critical" to its ability to maintain its "market-leading position" (per Nuance's 2010 10-k Report).

25.     Nuance's acquisitions of its competitors have frequently been preceded by assertions of patent lawsuits that resulted in the defendant capitulating to Nuance's aggressive acquisition strategy. As is evident from the publicly-available pleadings in those cases, Nuance has consistently engaged in a campaign to file patent infringement lawsuits against smaller competitors in bad faith in order to (a) harm their business relationships and reputations, (b) cause them to incur significant legal expenses, and (c) exert leverage to acquire them at a discounted price.

26.     In total, since 2001, Nuance has commenced at least seventeen patent actions worldwide against eight of its competitors. Only two such actions went to trial, and in both those instances, the jury determined that Nuance's patents were not infringed and/or Nuance's patents were invalid.

27.     As detailed further below, Nuance and Nuance Canada have recently deployed this strategy in an attempt to keep Omilia from expanding in the Canadian market by spreading injurious misinformation about Omilia to Omilia's new customer, TD Bank.

**Nuance's Relationship with Omilia and its Affiliates**

28.     Omilia is currently a direct competitor of Nuance in the ASR enterprise software market. However, it was previously a reseller for Nuance.

29.     Omilia was founded in 2002. When the company was started, Omilia's principal business was integrating and customizing other companies' speech recognition technology into solutions for other companies. In 2004, Omilia began to use Nuance's technology in some of the solutions it designed.

30.     While the solutions built on Nuance technology provided adequate functionality, Omilia and its customers found that the Nuance technology was insufficiently robust.

Novice users unfamiliar with using the system would frequently have difficulty being understood and having their calls fielded effectively.

31.    Omilia recognized that the Nuance technology had shortcomings, and set out to develop its own proprietary technology.

32.    By 2007, Omilia's efforts to develop improved software solutions had led to it developing its proprietary DM and NLU system, DiaManT.

33.    In 2007, Omilia began deploying solutions that were comprised of Omilia's DiaManT system and Nuance's ASR technology into call centre automation solutions. The resulting solutions were comparatively more robust. That same year, Omilia entered into an agreement with Nuance to be its reseller of Nuance ASR technology in Europe (the "Reseller Agreement").

34.    Omilia's success began to grow following the roll out of its DiaManT system.

35.    During the Greek financial crisis in 2010, Omilia explored with Nuance the possibility of a commercial partnership beyond the Reseller Agreement. These discussions culminated in a meeting between Omilia Managing Director Dimitris Vassos and Nuance Europe General Manager Peter MacKinnon in January 2011. No commercial partnership beyond the parties' then-existing reseller relationship was formed.

36.    During Mr. Vassos' meeting with Mr. MacKinnon, and related exchanges, Mr. Vassos provided Nuance with documents and information that described Omilia's proprietary DiaManT system. The basic architecture and key features of DiaManT have not changed since Mr. Vassos' discussions with Nuance in 2010 and 2011.

37.    In October 2013, following Omilia's continued success in European markets and elsewhere using its DiaManT system, Nuance required Omilia, under the pretense of a global partner review, to disclose its full list of customers and the projects on which Omilia was actively working. Omilia disclosed the requested information to representatives of Nuance on or around October 9, 2013. At the time, Nuance represented that it would maintain the customer list in confidence.

38.    Immediately following that disclosure however, Nuance used Omilia's customer list to target Omilia's customers in Europe. Nuance contacted a number of Omilia's current and prospective customers to promote Nuance's products.

39.    Shortly thereafter, on October 31, 2013, Nuance formally served Omilia with a 90-day notice of termination of the Reseller Agreement.

40.    Omilia lost customers to Nuance as a result of Nuance's conduct.

**Omilia Develops its Own ASR Technology**

41.    Following Nuance's termination of the Reseller Agreement, Omilia needed to find a new supplier of ASR technology that it could deploy in conjunction with its DiaManT system.

42.    Despite its efforts to do so, Omilia was not able to find a new partner that could provide adequate ASR technology. Omilia decided to develop its own ASR technology.

43.    Given the data Omilia had the foresight to collect on prior projects, it was able to develop a high performing ASR technology.

44.    By 2014, Omilia was deploying call centre solutions founded on 100% Omilia technology: Omilia ASR with the Omilia DiaManT system (NLU and DM).

45.    Following termination of the Reseller Agreement, Omilia exclusively offered customers ASR enterprise software comprised of its DiaManT technology combined with Omilia's own proprietary ASR engine.

**Omilia Enters the North American Market**

46.    After several years of increasing success selling its own complete ASR enterprise software in Europe, Omilia began focusing on expanding its business in North America. Its first major contract was with the Royal Bank of Canada, which it parlayed into connections in the United States.

47.    In response, Nuance commenced efforts to prevent Omilia from establishing itself as a competitor to Nuance in the United States market:

(a)    First, Nuance asserted, for the first time, that Omilia's technology infringed patents owned by Nuance. Nuance did so notwithstanding the fact that the basic architecture and key features of Omilia's DiaManT technology had not changed since Mr. Vassos's discussions with Nuance in 2010 and 2011.

(b)    Second, Nuance commenced a patent lawsuit against Omilia in the United States alleging infringement of a number of patents (the "**U.S. Patent Action**"). Nuance had purchased three of these patents (nos. 8,379,804, 8,521,534, and 8,532,993) after Mr. Vassos had provided Nuance with detailed information regarding Omilia's technology.

(c)    Third, Nuance commenced a campaign of providing misinformation to Omilia's customers, potential customers, and resellers in the United States.

48.    Omilia lost customers and business in the United States as a result of this conduct, which is the subject of litigation in the United States.

49.    Omilia's technology in no way infringes any patents asserted by Nuance whatsoever.

50.    Prior to filing the U.S. Patent Action, Nuance knew, based on information provided by Mr. Vassos to Nuance in 2010 and 2011, as well as from publicly-available information describing the Omilia systems, that the Omilia technology does not infringe the asserted patents.

51.    In addition, prior to commencing the U.S. Patent Action, Nuance knew or ought to have known that the asserted patents were invalid. Prior art that renders those patents invalid was directly available to Nuance, including through its ownership of and other roles (e.g. Board memberships) with organizations and companies that held such prior art.

**The TD Bank Project**

52.    In or around September 2018, TD Bank issued a Request for Information (**RFI**) to a short list of technology vendors about the vendors' technology offerings. In the RFI, TD Bank stated that it was seeking to build a new interactive voice response (**IVR**) platform

for its North American business lines which was capable of offering a best in class conversational experience. One of the recipients of the RFI was Connex Services Inc. ("**Connex**"), a Canadian technology company and partner of Omilia. Connex's response to the RFI involved the implementation of Omilia's ASR and DiaManT technology solutions. Nuance Canada was also a recipient of the RFI.

53.     In or around October 2018, following the vendors' responses to the RFI, Connex/Omilia and Nuance Canada were shortlisted and asked to respond to a Request for Proposal ("**RFP**") by TD Bank for an omni-channel customer service technology solution for deployment in its insurance business, TD Insurance (the "**TD Project**"). The TD Project was intended to be a pilot for the much larger project of overhauling TD Bank's IVR technology across its North American business lines.

54.     Nuance Canada submitted a proposal, as did Connex. Connex's proposal again involved the implementation of Omilia's technology solutions (the "**Connex/Omilia Proposal**"). Ultimately, Connex/Omilia's proposal was successful.

55.     Connex had a pre-existing master services agreement with TD Bank. Under the terms of the accepted RFP proposal, new Statements of Work for the TD Project would be entered into pursuant to the existing master services agreement.

56.     After winning the RFP for the TD Project, Omilia and Connex prepared Statements of Work for, and commenced work on, the TD Project.

57.     Omilia understood that if the TD Project was delivered as expected, TD Bank would expand the use of Omilia's technology solution beyond TD Insurance, across its other business lines. This would have included expansion into the United States.

58.     Nuance and Nuance Canada were aware that Connex/Omilia had won the RFP and were engaged in work on the TD Project. They knew this not only because Nuance Canada lost the RFP, but also because Nuance Canada supplies voice biometrics technology (i.e. for authenticating customers by telephone) to TD Bank, which would have to be integrated with the solution being implemented by Connex/Omilia. Indeed, in their capacity as suppliers of voice biometrics technology to TD Bank, Nuance Canada representatives were present at a TD Project kick-off meeting with Connex/Omilia and TD Bank in late 2018.

59.     Following Connex/Omilia's success in the TD RFP process, Nuance Canada began deploying its customary business tactics, this time targeting Omilia and its efforts to break into the Canadian market.

60.     On November 4, 2019, TD Bank convened an urgent conference call with Connex and Omilia (the "**Conference Call**").

61.     During the Conference Call, Aaron Clark, Gregory Smith, and Tina Robinet of TD Bank's Insurance Group advised Connex and Omilia that representatives of Nuance Canada had contacted them and made the following representations:

   (a)   Omilia's ASR and DiaManT technology are inferior to Nuance's technology;

   (b)   Omilia's ASR and DiaManT technology clearly infringe Nuance's patents;

   (c)   Nuance commenced a lawsuit against Omilia in the United States because of that infringement, which was going to be successful;

   (d)   Omilia was going to be sufficiently financially damaged by the lawsuit that it would cease operations; and

   (e)   For all these reasons, TD Bank should not use Omilia technology for the TD Project (together with the above, the "**Statements**").

62.     Omilia pleads that the Statements were made to Aaron Clark, Gregory Smith, and Tina Robinet of TD Bank by Robin Langlois and Michael She of Nuance Canada on or about November 4, 2019. The exact day and time the Statements were made and by what means are details that are known to Nuance and Nuance Canada, but are not presently known to Omilia.

63.     Each of the Statements constituted a misrepresentation by Nuance Canada to TD Bank, each of which it knew or ought to have known was false.

64.     As a direct result of the Statements, TD Bank halted the TD Project and advised Connex and Omilia to stop all work. As a direct result of the Statements, TD Bank refused to formalize any further work that would involve the use of Omilia technology. As a direct

result of the Statements, Connex and Omilia have lost the TD Project and the likelihood of further business from TD Bank's other business lines.

65.    As the makers of the other bid that was shortlisted in TD Bank's RFP process, Nuance Canada is likely to now be awarded some or all of the work that was to be performed by Connex/Omilia on the TD Project, and for TD Bank's other business lines. Nuance Canada therefore stands to profit directly from its wrongdoing.

**LIABILITY OF THE DEFENDANTS**

### a) Injurious falsehood

66.    The Statements made by Nuance Canada are false and disparaging of Omilia's business and its products.

67.    The allegation that Omilia's technology infringes Nuance's asserted patents in the U.S. Patent Action is completely false.

68.    Moreover, the overall impression Nuance Canada conveyed in the Statements was also false and misleading, including because Nuance Canada portrayed the U.S. Patent Action as meritorious and likely to succeed when it knew that the litigation was unmeritorious and tactical, in keeping with its usual business practices. The U.S. Patent Action was commenced for the purpose of being able to raise it with Omilia's customers and potential customers in a way that completely misrepresents the merits of the litigation in order to cause Omilia to lose business.

69.    The impression left by the Statements was that there was a reasonable likelihood that the U.S. Patent Action would succeed and Omilia would be left insolvent or significantly financially injured, and/or that Omilia would be prevented from deploying, and its customers prevented from using, Omilia's solutions.

70.    The Statements were published to third parties including TD Bank. Nuance Canada made the Statements maliciously and with the deliberate intention to injure Omilia. In the alternative, the Statements were made with reckless indifference as to whether their publication would injure Omilia. The Statements were made without just cause or excuse.

71.     The Statements have resulted in pecuniary losses to Omilia including, but not limited to, lost profits on the TD Project and TD Bank's other business lines, and injury to Omilia's position in the market in Canada, the full extent of which is not yet known. Nuance and Nuance Canada stand to benefit directly from Omilia's losses in respect of the TD Project, TD Bank's other business lines, and positioning in the Canadian ASR technology market more generally. Nuance knew or ought to have known that the Statements were likely to have such effects.

### b) Defamation

72.     The Statements were communicated to third parties including TD Bank by Nuance Canada and were thereby published. At this time the full circulation of the Statements to third parties is unknown to Omilia, but is known to Nuance and Nuance Canada.

73.     The Statements made by Nuance Canada were not general in nature, they referred explicitly and specifically to Omilia.

74.     The Statements would have been understood in accordance with their literal meanings. Additionally, they would have been understood to convey that relying on Omilia technology was a bad business decision, and that TD Bank and other companies should not work with Omilia.

75.     The Statements caused and continue to cause significant harm to Omilia, including but not limited to, lost revenue and profits, harm to reputation, loss of partnership and customer opportunities, and injury to Omilia's position in the market including Ontario. Nuance and Nuance Canada stand to benefit directly from Omilia's losses in respect of the TD Project, TD Bank's other business lines, and positioning in the Canadian ASR technology market more generally.

76.     Nuance Canada has declined to take steps to remedy the injury caused by the false and defamatory Statements. Nuance Canada has not retracted the Statements nor provided an apology nor corrections.

77.     Nuance Canada acted with malice in making the Statements. The representations contained in the Statements were known by Nuance Canada to be untrue at the time which it made them. Nuance Canada made the Statements with the intention of harming Omilia. In fact, Nuance Canada commenced the unmeritorious U.S. Patent Action for the

express purpose of using it to mislead Omilia's customers into thinking that Omilia's technology infringed patents and that Omilia would not be in business for long, and that third parties would not be permitted to use Omilia's supposedly patent-infringing technology.

78.     In the alternative, Nuance Canada made the Statements with reckless indifference with respect to the harm Omilia would suffer as a result of the Statements.

### c) Breach of Section 52(1) of the *Competition Act*

79.     The Statements made by Nuance Canada to TD Bank constitute representations to the public within the meaning of Section 52(1) of the *Competition Act*, or ought to be deemed to constitute such representations to the public. As set out above, the Statements contained specific material false and misleading representations.

80.     Nuance Canada made the representations in the Statements knowing that they were materially false and misleading, both in their specific literal meaning and the overall impression they conveyed to TD Bank. In the alternative, Nuance Canada made some of the representations in the Statements recklessly.

81.     Nuance Canada made the false and misleading representations in the Statements for the purpose of promoting the use of its own products and its own business interests, at the expense of Omilia.

82.     Such conduct constitutes offences under Part VI of the *Competition Act*, in particular, section 52(1) of the *Competition Act*. Omilia claims losses and damages under section 36(1) of the *Competition Act* in respect of such unlawful conduct.

83.     The Statements have resulted in pecuniary losses to Omilia including, but not limited to, lost profits on the TD Project and TD Bank's other business lines, and injury to Omilia's position in the market in Canada, the full extent of which is not yet known. Nuance and Nuance Canada stand to benefit directly from Omilia's losses in respect of the TD Project, TD Bank's other business lines, and positioning in the Canadian ASR technology market more generally.

### d) Intentional Interference with Economic Relations

84.     By its conduct, Nuance Canada has intentionally interfered with Omilia's economic relations. Nuance commenced the unmeritorious U.S. Patent Action and then Nuance Canada disseminated false and damaging information to TD Bank and its representatives.  Nuance Canada's intent was to encourage TD Bank to cease doing business with Omilia. Nuance Canada's intent was to harm Omilia.

85.     Nuance Canada's interference was by unlawful means. This included, but may not be limited to, the torts of negligent or fraudulent misrepresentation, misrepresentations contrary to Section 52(1) of the *Competition Act*, injurious falsehood, and conspiracy.

86.     Omilia has suffered economic harm as a result, including but not limited to, lost profits, harm to reputation, loss of partnership and customer opportunities, and injury to Omilia's position in the market including Ontario. Nuance and Nuance Canada stand to benefit directly from Omilia's losses in respect of the TD Project, TD Bank's other business lines, and positioning in the Canadian ASR technology market more generally.

### e) Unjust Enrichment

87.     As a result of the conduct described above, Nuance Canada has been unjustly enriched.

88.     Nuance Canada has been or will be enriched by the awarding of some or all of the work that was to be performed by Omilia on the TD Project and for other TD Bank business lines to Nuance Canada. This enrichment corresponds to Omilia's deprivation of that work and consequent revenue.

89.     Further, Nuance Canada's conduct in disseminating false, misleading, and injurious information about Omilia and its products, and causing injury to Omilia's relationship with TD Bank, has and will cause Nuance Canada to assume a larger share of the market in Canada than they would otherwise occupy, at the expense of Omilia's market share.

90.     There is no juristic reason why Nuance and/or Nuance Canada should be permitted to retain the financial gains and benefits that have flowed from such misconduct.

**Conspiracy between Nuance and Nuance Canada**

91.     Nuance acted in concert, by agreement, or with a common design with Nuance Canada to make the Statements, which conduct was unlawful and directed towards harming Omilia.

92.     Nuance and Nuance Canada knew in the circumstances that Omilia was likely to suffer injury as a result of the Statements, and in fact the Statements did cause injury to Omilia.

93.     In addition, Nuance and Nuance Canada agreed to make the Statements for the predominant purpose of causing injury to Omilia. In fact, the Statements did cause injury to Omilia including but not limited to, lost profits from the TD Project and TD's other business lines, harm to Omilia's reputation, loss of partnership and customer opportunities with Connex, TD Bank, and others, and injury to Omilia's position in the Canadian market. Nuance and Nuance Canada stand to benefit directly from Omilia's losses in respect of the TD Project, TD Bank's other business lines, and positioning in the Canadian ASR technology market more generally.

94.     Nuance acted in concert with Nuance Canada in respect of the conduct ascribed to Nuance Canada herein. Nuance stands to directly benefit from the blocking of Omilia's ability to enter the Canadian market.

**Damages**

95.     Omilia has suffered significant harm as a result of Nuance and Nuance Canada's actions, including but not limited to, lost revenue and profits, harm to reputation, loss of partnership and customer opportunities, and injury to Omilia's position in the market including Ontario.

96.     Omilia's lost profits on the TD Project are $3,757,110 and its lost profits on the further business with TD Bank's other business lines are $29,460,420.

97.     Further, and as described above, Nuance and Nuance Canada stand to benefit financially from their misconduct. Omilia pleads waiver of tort, and that Nuance and Nuance Canada be disgorged of any and all monies received as a consequence of any wrongdoing perpetrated by them upon Omilia.

98.    Omilia further pleads that all monies obtained by Nuance and Nuance Canada as a result of their wrongful conduct should be traced and held in constructive trust in favour of Omilia.

99.    Further particulars of damages will be provided as they become known.

**Punitive, Aggravated, and Exemplary Damages**

100.    Nuance and Nuance Canada's conduct has been egregious. Nuance and Nuance Canada used, and continue to use, their market dominance, conspiracy, and misrepresentations to maintain a dominant market share. More specifically, their deliberate and sustained targeting of Omilia and efforts to prevent Omilia from entering the Canadian ASR market has caused Omilia significant injury. It would have been known by Nuance and/or Nuance Canada that its conduct would have had such an effect on Omilia. The conduct of Nuance and Nuance Canada was, and remains, high-handed, reckless, without care, deliberate, and in disregard of Omilia's rights and interests. The public is also harmed by Nuance and Nuance Canada's conduct, the consequence of which is to impede and lessen competition in the Canadian ASR technology market.

101.    Accordingly, Omilia requests substantial punitive, exemplary, and aggravated damages be awarded, in the amount of $1,000,000.

**Joint and Several Liability**

102.    Nuance and Nuance Canada are jointly and severally liable for the claims and damages set out herein.

103.    Whenever reference is made herein to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

**Service**

104.    Omilia pleads it is permitted to serve this Statement of Claim (the "Claim") on Nuance outside of Ontario without leave pursuant to subrules 17.02 (g) and (p), on the grounds that the Claim:

    (a)    Relates to torts committed in Ontario; and

    (b)    Is against persons carrying on business in Ontario.

**Legislation and Place of Trial**

105.    The plaintiffs plead and rely upon the *Courts of Justice Act*, R.S.O. 1990, c. C.43, the *Libel and Slander Act*, R.S.O. 1990, c. L.12, and the *Competition Act*, R.S.C. 1985, c. C-34, each as amended.

106.    The plaintiff proposes that this action be tried in Toronto, Ontario.

March 4, 2020

**McCarthy Tétrault LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto ON  M5K 1E6

**Moya Graham  LSO#: 58585F**
Tel: 416-601-8207

**William L. Main  LSO#: 70969C**
Tel: 416-601-8235
Fax: 416-868-0673

Lawyers for the Plaintiff

OMILIA NATURAL LANGUAGE Case 1:19-cv-11488-RBB Document 70 Filed 03/10/20 Page 26 of 26
SOLUTIONS, LTD.   and   et al.
Plaintiff        Defendants

Court File No.:

*W 20 0063743.5 0000*

---

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**

Proceeding commenced at TORONTO

---

**STATEMENT OF CLAIM**

---

**McCarthy Tétrault LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto ON  M5K 1E6

**Moya Graham**   LSO#: 58585F
Tel: 416-601-8207

**William L. Main**   LSO#: 70969C
Tel: 416-601-8235
Fax: 416-868-0673

Lawyers for the Plaintiff

DOCS 19860844