**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                )
NUANCE COMMUNICATIONS, INC.,     )
                                )
              Plaintiff,         )
                                )           Civil Action
        v.                       )           No. 19-11438-PBS
                                )
OMILIA NATURAL LANGUAGE SOLUTIONS, )
LTD.,                            )
                                )
              Defendant.         )
_____)

## MEMORANDUM AND ORDER

May 6, 2020

Saris, D.J.

Plaintiff Nuance Communications, Inc. brings this action against Defendant Omilia Natural Language Solutions, Ltd., alleging infringement of eight patents concerning automated speech recognition and interactive voice response systems used in large scale call centers.

Omilia counter-punched with numerous counterclaims alleging, among other things, a violation of Section 2 of the Sherman Act (Count 17); a violation of Section 7 of the Clayton Act (Count 18); common law unfair competition (Count 19); tortious interference with contractual relations (Count 20); and

tortious interference with advantageous business relations (Count 21)[1].

Now, Nuance moves to dismiss Omilia's antitrust and state law counterclaims (Counts 17-21), or in the alternative to stay those counterclaims pending resolution of the underlying patent infringement suit. After hearing, the Court **ALLOWS** the motion to dismiss Omilia's claim of common law unfair competition (Count 19) and **DENIES** the motion with regard to Omilia's remaining antitrust and state law counterclaims.

**FACTUAL BACKGROUND**

The following facts are drawn from Omilia's countercomplaint (Docket No. 44) and must be taken as true at this stage. See Newman v. Lehman Bros. Holdings Inc., 901 F.3d 19, 25 (1st Cir. 2018).

I.   **Nuance**

Nuance develops and provides Automated Speech Recognition ("ASR") technology, which allows a machine to recognize and respond to human voice commands. Nuance's ASR software is used by enterprise-level call centers around the world.

Nuance was created in 2005 from a merger of ScanSoft and another entity named Nuance ("Pre-2005 Nuance"). ScanSoft had already acquired at least three other voice recognition firms

---

[1] Omilia's answer labeled this claim as Count 20. Docket No. 44 at 68.

between 2001 and 2005. From 2005 to 2018, the newly formed Nuance acquired at least 16 additional companies "that developed and/or commercialized voice recognition-related technology." Docket No. 44 ¶ 106. Nuance also acquired over 5,000 voice-recognition related patents during the 2005-2018 timeframe. Omilia alleges that, due to these corporate and intellectual property acquisitions, Nuance has maintained an international market share of over 70% since 2001.[2] Nuance is now the owner of one of the largest speech-recognition patent portfolios in the world.

Omilia alleges that Nuance has a strategy of "acquir[ing] actual and potential competitors through a calculated scheme of threatening to assert and/or actually asserting baseless patent infringement litigation using its massive portfolio of acquired patents to drive its competitors out of the market and/or coerce them into being acquired by Nuance." Id. ¶ 112. Since 2011, ScanSoft/Nuance has initiated at least seventeen patent lawsuits against its competitors. At least three of these lawsuits were initiated shortly after the defendant corporation refused a buy-out offer by Nuance.

---

[2] Omilia argues that the Court may reasonably infer that, given Nuance's 70% international market share, Nuance's market share within the United States is at least 70%. See Dkt. No. 80 at 44 (motion hearing transcript).

Omilia alleges that this strategy enables Nuance to "maintain supra-competitive prices for its software . . . without innovating that software, which it would have been forced to do" if it was subject to competition. Id. ¶ 114. For example, Nuance introduced a new major release related to its speech recognition software once a year between 1994 and 2005, but since 2005 has issued only three new releases. The Department of Justice ("DOJ") Antitrust Division investigated a Nuance transaction related to the medical transcription sector in 2008 and "raised concerns" about Nuance's proposed acquisition of a voice recognition firm in 2009. Id. ¶ 115.

## II. Omilia's Relationship with Nuance

Omilia is a Cyprus-based company that sells a proprietary ASR software system for use in large enterprise call centers. Omilia resold Nuance's ASR technology from 2007 to 2013, along with Omilia's own proprietary natural language understanding ("NLU") engine and dialogue manager ("DM").

In April 2010, Omilia's Managing Director Dimitris Vassos contacted Nuance's CEO to discuss the possibility of an expanded partnership. Vassos met with Peter MacKinnon, the General Manager of Nuance Europe, in January 2011. During that meeting and in related emails, Vassos provided Nuance with documents describing Omilia's proprietary NLU and DM system, known as DiaManT.

In 2012, Nuance introduced an amendment to its reseller
agreement with Omilia. The amendment required Omilia to bundle
Nuance's professional support services with Omilia's products
and required Omilia to sell the full stack of Nuance's products,
so that Omilia could not integrate Omilia's NLU with Nuance's
ASR. Omilia alleges that Nuance implemented the same amendments
with other resellers, in order to use its dominant position in
the ASR market to gain monopoly profits in the market for
professional services.

In October 2013, Nuance asked Omilia to disclose its full
list of customers and projects as part of a "global partner
review." Id. ¶ 125. Nuance represented that it would maintain
the list in confidence. However, soon after Omilia provided the
list, Nuance contacted an Omilia customer and an Omilia partner
organization, allegedly to interfere with Omilia's relationships
with those organizations. On October 31, 2013, Nuance served
Omilia with a 90-day notice to terminate the Nuance-Omilia
reseller agreement. After termination of the reseller agreement,
Omilia implemented a proprietary ASR technology.

### III. __Procedural Background__

In January 2018, Nuance sent Omilia a letter demanding it
to submit to an audit of all transactions and royalty payments
it received from any customer since the inception of its
Reseller Agreement with Nuance. Omilia refused this demand. In

September 2018, Nuance sent Omilia a letter asserting that
Omilia's systems infringe three patents owned by Nuance. Two of
those patents are at issue in Nuance's infringement lawsuit
here.

Omilia alleges that before Nuance sent the September 2018
letter, Nuance represented to Omilia's customers and potential
customers in the U.S. and Canada that it had already brought a
patent infringement lawsuit against Omilia. Omilia claims it
lost commercial opportunities and "hundreds of millions of
dollars of potential revenue" due to those representations. Id.
¶¶ 133-34.

In March 2019, Omilia responded to Nuance's letter, stating
that Omilia did not infringe Nuance's patents. In June 2019,
Nuance filed suit in this Court, alleging that Omilia infringed
eight of its patents. Omilia subsequently filed a motion to
dismiss for lack of personal jurisdiction, which this Court
denied in December 2019.

Omilia filed an Answer and Counterclaims in November 2019.
Omilia alleged that Nuance engaged in a "monopolistic scheme" in
the ASR Enterprise Software Market in the United States by
acquiring more than fifty companies and "thousands" of patents.
Id. ¶¶ 91, 143-44, 146. Omilia also claimed that Nuance told at
least two actual or potential Omilia customers, Connex and TD
Bank, about Omilia's alleged patent infringement. Nuance filed

the present motion to dismiss in January 2020, and Omilia opposed in February 2020.

The underlying patent dispute is scheduled to proceed in phases. Claims related to two of the eight patents will be considered during Phase 1, for which a trial is currently scheduled for October 2021.

## STANDARD OF REVIEW

A Rule 12(b)(6) motion is used to dismiss complaints that do not "state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, the factual allegations in a complaint must "possess enough heft" to state a claim to relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–57 (2007). In evaluating the motion, the Court must accept the factual allegations in the plaintiff's complaint as true, construe reasonable inferences in his favor, and "determine whether the factual allegations in the plaintiff's complaint set forth 'a plausible claim upon which relief may be granted.'" Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71 (1st Cir. 2014) (quoting Woods v. Wells Fargo Bank, N.A., 733 F.3d 349, 353 (1st Cir. 2013)).

In addition to the complaint, the court may also consider "documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice."

7

Haley v. City of Boston, 657 F. 3d 39, 46 (1st Cir. 2011)
(cleaned up).

## DISCUSSION

### I.   Antitrust Claims

Nuance argues that Omilia's antitrust claims should be
dismissed because (1) Omilia fails to allege unlawful
monopolization under Section 2 of the Sherman Act; (2) Omilia
fails to plead a plausible market definition for its Sherman Act
and Clayton Act claims; and (3) all but one of the transactions
challenged by Omilia under the Clayton Act are time-barred by
the four-year statute of limitations period, and the single
remaining transaction is insufficient to state a claim.

### A. Section 2 of the Sherman Act (Count 17)

Nuance argues that Omilia fails to allege unlawful
monopolization under Section 2 of the Sherman Act. That section
imposes liability upon "every person who shall monopolize, or
attempt to monopolize . . . any part of the trade or commerce
among the several States." 15 U.S.C. § 2. To establish a Section
2 monopolization claim, a plaintiff must show "(1) that the
defendant possesses monopoly power in the relevant market, and
(2) that the defendant has acquired or maintained that power by
improper means." In re Lantus Direct Purchased Antitrust
Litigation, 950 F.3d 1, 7 (1st Cir. Feb. 13, 2020) (quoting Town
of Concord v. Bos. Edison Co., 915 F.2d 17, 21 (1st Cir. 1990)).

Here, neither party contests that Nuance plausibly possesses monopoly power in the ASR Enterprise Market. The parties disagree about the proper geographic scope of that market, as described below in section I.B. The parties also disagree as to whether Omilia has plausibly alleged that Nuance has acquired or maintained its monopoly power by improper means.

Omilia alleges that Nuance has a strategy of "acquir[ing] actual and potential competitors through a calculated scheme of threatening to assert and/or actually asserting baseless patent infringement litigation using its massive portfolio of acquired patents to drive its competitors out of the market and/or coerce them into being acquired by Nuance." Docket No. 44 ¶ 112; see id. ¶ 118 (quoting New York Times report that Nuance's CEO had told a potential competitor, "I have patents that can prevent you from practicing in this market."); id. ¶¶ 117, 119 (providing additional example of lawsuit filed after a competitor refused a buy-out offer). Omilia supports this theory with examples of Nuance acquiring competitors and patents in the ASR market, pursuing patent enforcement lawsuits, and "interfer[ing] with rivals' relationships with customers." Docket No. 72-1 at 3; see also Docket No. 44 ¶¶ 91-92, 125-27, 129, 132-33. Nuance responds that each of the individual complained-of acts are lawful. See, e.g., Automatic Radio Mfg. Co. v. Hazeltine Res. Inc., 339 U.S. 827, 834 (1950) ("[M]ere

9

accumulation of patents, no matter how many, is not in and of itself illegal.").

In the antitrust context, however, "acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme." Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 707 (1962); see also id. at 699 ("[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."); LePage's Inc v. 3M, 324 F.3d 141, 162 (3d Cir. 2003) (explaining that "courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation"); City of Anaheim v. S. Cal. Edison Co., 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect.")

Courts examining a monopolist's otherwise lawful acts must ask whether the actions "impaired competition in an unnecessarily restrictive way," such as by "exclude[ing] rivals on some basis other than efficiency." Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 (1985); see also Barry Wright Corp. v. ITT Grinell Corp., 724 F.2d 227, 230 (1st Cir. 1983) (asking whether the defendant's conduct was "reasonable in light of its business needs" or whether it "unreasonably

10

restrict[ed] competition"). A motion to dismiss a Section 2 claim must be denied if there is a plausible allegation that the defendant acted to artificially restrict competition and inflate prices in the market. See In re Lantus, 950 F.3d at 7 (reversing dismissal of antitrust claims).

Here, Omilia has plausibly alleged that Nuance violated Section 2 of the Sherman Act by wielding its pool of patents against competitors to threaten costly, baseless litigation unless the competitors agree to a buy out or merger, and by notifying the competitors' potential customers of the possibility of litigation, all with an anti-competitive motive. Cf. Kobe, Inc. v. Dempsey Pump Co., 198 F.2d 416, 423-24 (10th Cir. 1952) (upholding jury's finding of violations of Sections 1 and 2 of the Sherman Act where defendant had monopoly on patents in market and sent plaintiff's potential customers notices of patent infringement lawsuits). Omilia has plausibly alleged that a monopolization scheme by Nuance has resulted in supracompetitive prices for customers and less frequent innovation for consumers, and impeded Omilia's ability to compete in the ASR Enterprise market.

   1. *Noerr-Pennington Doctrine and "Sham" Litigation Exception*
      a. Legal Framework

   The Noerr-Pennington doctrine "provides a party immunity from antitrust liability for . . . enforcing one's intellectual

property rights in court." United Food & Commercial Workers
Unions & Employers Midwest Health Benefits Fund v. Novartis
Pharms. Corp., 902 F.3d 1, 4-5 (1st Cir. 2018); see also Cal.
Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510
(1972). The immunity is grounded in the First Amendment right to
petition the government. Novartis, 902 F.3d at 4-5.

"Noerr-Pennington immunity has two exceptions. An antitrust
defendant may not enjoy the immunity in enforcing its patent if
it obtained that patent through a fraud on the Patent Office, or
if its suit to enforce the patent is a 'sham' for impermissible
anti-competitive conduct." Id. at 5 (citations omitted).

The "sham" litigation exception to Noerr-Pennington
immunity applies if the lawsuit is (1) "objectively baseless in
the sense that no reasonable litigant could realistically expect
success on the merits," and (2) "conceals 'an attempt to
interfere directly with the business relationships of a
competitor' through the 'use [of] the governmental process – as
opposed to the outcome of that process – as an anticompetitive
weapon.'''" Id. at 13 (citation omitted). An objectively
reasonable patent suit is not a "sham" within the meaning of the
exception to Noerr-Pennington immunity, even if the litigant has
a subjective intent to monopolize. Prof'l Real Estate Investors,
Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 57 (1993)
("PREI").

b. Parties' Arguments

Nuance argues that Omilia's Section 2 counterclaim must be dismissed because Nuance enjoys <u>Noerr-Pennington</u> immunity. Omilia responds that the "sham" litigation exception to <u>Noerr-Pennington</u> immunity applies because Nuance's patent infringement lawsuit is objectively baseless and intended to harm competition. Omilia also points to Nuance's past lawsuits against other competitors as evidence of a "pattern of anticompetitive conduct." Docket No. 74 at 8.

It is premature for the court to determine whether <u>Noerr-Pennington</u> immunity applies here. Without a claim construction hearing and discovery, this court has no basis to assess the merits of the underlying patent suit. Moreover, even if the litigation is not baseless, Omilia has also alleged non-litigation conduct by Nuance, such as threats to litigate if a competitor does not agree to a buy-out, threats to competitors' customers, and statements to the market via the press regarding Nuance's buy-out strategy. The motion to dismiss the Sherman Act Section 2 claim under the <u>Noerr-Pennington</u> doctrine is accordingly denied.

## B. Market Definition (Counts 17 and 18)

Nuance also alleges that Omilia fails to plead a plausible market definition for its antitrust claims. Antitrust plaintiffs must allege both a plausible product market and plausible

geographic market. Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 197 & n.11 (1st Cir. 1996). A geographic market is "the geographic area in which the defendant faces competition and to which consumers can practically turn for alternative sources of the product." Id. at 196; see also United States v. Phila. Nat'l Bank, 374 U.S. 321, 259 (1963).

Neither party contests Omilia's product market definition of the "ASR Enterprise software market." The conflict centers on the geographic market definition: Omilia alleges that the geographic market for its Sherman and Clayton Act claims is the United States. Nuance contends that this allegation, on its own, is insufficient to survive a motion to dismiss, because the market for ASR Enterprise Software is global, or at least includes all English-speaking countries.

Market definition is a question of fact that generally cannot be decided on a motion to dismiss. See Morales-Villalobos v. Garcia-Llorens, 316 F.3d 51, 55 (1st Cir. 2003) (reversing a motion to dismiss because parties' dispute as to whether the relevant geographic market was an individual town, all of Puerto Rico, or the entire United States could not "be resolved on the face of the complaint"); see also Coastal Fuels, 79 F.3d at 196 ("[M]arket definition is a question of fact.").

Here, Omilia has plausibly alleged that the United States is the relevant geographic market for its antitrust claims.

14

Omilia alleges that Nuance uses its U.S. patents to exclude
competitors within the United States. Omilia also alleges
"massive barriers to entry" to the market due to challenges in
"acquiring the [speech] data required to train an ASR system."
Docket No. 44 ¶ 145; see also id. ¶ 94 (explaining that "time-
intensive analysis of real-life human speech for a given
language . . . is critical for an ASR engine to function well as
to that language"). Given the location-specific nature of the
technology, Omilia has plausibly alleged that the United States
is "the geographic area in which [Nuance] faces competition, and
to which consumers can practically turn for alternative sources
of the product." See Coastal Fuels, 79 F.3d at 196. These
allegations are sufficient to survive a motion to dismiss.

### C. **Clayton Act (Count 18)**

Nuance argues that Omilia's claim under Section 7 of the
Clayton Act is time-barred and insufficient to state a claim.
Omilia alleges that in the four years prior to this suit, Nuance
acquired patents related to "speech recognition that's used in
enterprises in the United States." Docket No. 80 at 40 (hearing
transcript); Docket No. 51 at 21 & n.4. Moreover, Omilia argues
that its challenges to Nuance's earlier acquisitions are not
time-barred under the Clayton Act, because those acquisitions
ripened into a prohibited effect and caused Omilia injury within
the four-year limitations period.

Section 7 of the Clayton Act prohibits asset acquisitions
whose effect "may be substantially to lessen competition, or to
tend to create a monopoly." 15 U.S.C. § 18. The statute requires
Section 7 claims to be brought "within four years after the
cause of action accrued." 15 U.S.C. § 15(b).

The Supreme Court has articulated two formulations of
Section 7's "accrual" standard. In a case brought by the United
States, the Court held that a Section 7 claim accrues "any time
when the acquisition threatens to ripen into a prohibited
effect." United States v. E.I. du Pont de Nemours & Co., 353
U.S. 586, 587 (1957) (permitting Section 7 prosecution to
proceed thirty years after the challenged stock acquisition,
even where no anticompetitive threat existed at the time of the
acquisition). In a case brought by a private plaintiff, the
Court held that a Section 7 claim accrues "when a defendant
commits an act that injures a plaintiff's business." Zenith
Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338
(1971).

Although these capacious holdings have been criticized,
see, e.g., Paul J. Stancil, Atomism and the Private Merger
Challenge, 78 Temp. L. Rev. 949, 1011 (2005), they are still
applied. See id. (describing the precedents as "still-valid (and
still-cited)"); see also United States v. ITT Cont'l Baking Co.,
420 U.S. 223, 240 (1976) (holding that Section 7's restriction

16

on "acquisitions" includes "both the purchase of rights in another company and the retention of those rights"); U.S. Gypsum Co. v. Indiana Gas Co., Inc., 350 F.3d 623, 628 (7th Cir. 2003) (explaining that "old activity . . . is not immunized, if the potential for [an antitrust injury] is created or realized more recently as market conditions change"); Telectronics Proprietary, Ltd. v. Medtronic, Inc., 687 F. Supp. 832, 844 (S.D.N.Y. 1988) (denying summary judgment because of factual dispute existed as to whether plaintiff suffered Section 7 injury when defendant acquired certain patents or when defendant asserted those patents against the plaintiff). Cf. Midwestern Machinery, Co., Inc. v. Nw. Airlines, Inc., 392 F.3d 265, 276 (8th Cir. 2004) (holding, at summary judgment stage, that Section 7 claim was barred because plaintiffs had not filed suit within four years of suffering "a quantifiable injury"); Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1051 (8th Cir. 2000) (explaining that the Clayton Act's statute of limitations can be tolled "where a plaintiff's damages are only speculative during the limitations period"); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 320b (4th Ed. 2013-2018) (explaining that antitrust cause of action accrues at time plaintiff is injured, even if defendant committed the illegal act more than four years before the injury); id. § 320d ("In some cases the

17

injury caused by a merger might not occur until many years after the transaction was completed.").

Here, Omilia alleges that its Section 7 claim accrued within the statute of limitations because Nuance's past acquisitions "ripened into a prohibited effect" and caused Omilia an injury within that timeframe. Docket No. 74 at 8. Specifically, Omilia alleges it "discovered the effects of Nuance's anticompetitive acquisitions" only when it attempted to enter the U.S. market in 2015 and 2016. Id. Omilia has plausibly alleged a Section 7 violation within the four-year statute of limitations.

## II.  **State Law Claims**

### A. **Unfair Competition (Count 19)**

Omilia alleges that Nuance is liable for the Massachusetts common law tort of unfair competition. However, "[i]t is settled in Massachusetts that 'the gravamen of an unfair competition claim is the likelihood of consumer confusion as to the source of the goods or services.'" Open Software Found., Inc. v. U.S. Fid. & Guar. Co., 307 F.3d 11, 17 (1st Cir. 2002) (quoting Datacomm Interface, Inc v. Computerworld, Inc., 489 N.E.2d 185, 191 (Mass. 1986)).

Here, Omilia has failed to allege any customer confusion regarding the source of an ASR product. Instead, Omilia argues that Nuance engaged in unfair competition under Massachusetts

18

common law by providing Omilia's customers with incorrect
information regarding the instant patent infringement suit.
Omilia has not cited any case law to support this interpretation
of the unfair competition tort. Omilia's unfair competition
claim is therefore dismissed for failure to state a claim upon
which relief can be granted. See Pegasystems, Inc. v. Appian
Corp., No. 19-11461, 2019 WL 6560120, at *6 (D. Mass. Dec. 5,
2019) (dismissing unfair competition claim for failure to allege
customer confusion about the source of litigant's products).

B. **Tortious Interference (Counts 20 and 21)**

Omilia also brings counterclaims against Nuance for
tortious interference with contractual relations (Count 20) and
advantageous business relations (Count 21). Omilia alleges that
Nuance intentionally and with improper means informed Omilia's
current and prospective customers of the instant patent lawsuit
in order to interfere with Omilia's contractual and business
relations. Nuance responds that these claims must fail because
Nuance's conduct was incidental to lawful patent enforcement
protected by Noerr-Pennington immunity.

Under Massachusetts law, a plaintiff claiming tortious
interference must show "(1) a business relationship or
contemplated contract of economic benefit; (2) the defendant's
knowledge of such relationship; (3) the defendant's interference
with the relationship through improper motive or means; and, (4)

the plaintiff's loss of advantage as a direct result of the defendant's conduct." Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25, 47 (1st Cir. 2002) (citation omitted). Here, Omilia alleges that Nuance knowingly communicated with Omilia's current client Connex and prospective client TD Bank regarding the instant patent lawsuit. Omilia alleges that as a direct result of these actions, Omilia "suffered substantial economic damages." Docket No. 44 ¶¶ 163, 168. Omilia has plausibly alleged claims of tortious interference with contractual and advantageous business relations.

Some courts have held that communications related to ongoing patent suits are protected by Noerr-Pennington immunity in some circumstances. Compare Golan v. Pingel Enter., Inc., 310 F.3d 1360, 1364-65 (Fed. Cir. 2002) (holding that notices sent to distributors of alleged infringer were protected by Noerr-Pennington immunity, because they were not sent in bad faith despite the patent having been expired at the time the letters were sent) and Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting Ltd., No. 02-12102, 2006 WL 1766434, at *35 (D. Mass. June 28, 2006) (dismissing tortious interference claim because defendant's communication with plaintiff's business partner regarding court's preliminary injunction decision was an act "incidental to protected litigation"), with Nuance Commc'ns, Inc. v. MModal LLC, No. 17-01484, 2018 WL 6804488, at *3 (D.

20

Del. Dec. 27, 2018) (explaining that "blog posts and press releases providing status updated regarding the litigation" did not enjoy <u>Noerr-Pennington</u> immunity). Here, Omilia argues that <u>Noerr-Pennington</u> immunity does not protect Nuance from tort liability because some communications were made before the patent lawsuit was filed. Omilia has plausibly alleged claims for tortious interference.

### III. <u>Request to Bifurcate and Stay Discovery</u>

Nuance argues that if dismissal is not warranted, discovery on Omilia's antitrust and state law counterclaims should be stayed pending resolution of the patent infringement claims. Federal Rule of Civil Procedure 42(b) permits bifurcation of claims "[f]or convenience, to avoid prejudice, or to expedite and economize" issues for trial. "[F]ederal courts possess the inherent power to stay proceedings for prudential reasons." <u>Microfinancial, Inc. v. Premier Holidays Intern., Inc.</u>, 385 F.3d 72, 77 (1st Cir. 2004).

The Federal Circuit has noted that the "standard practice" is to separate "for <u>trial</u> patent issues and those raised in an antitrust counterclaim." <u>In re Innotron Diagnostics</u>, 800 F.2d 1077, 1084 (Fed. Cir. 1986) (emphasis added). This Court has affirmed that view multiple times. <u>See, e.g.</u>, <u>Hewlett-Packard Co. v. Genrad, Inc.</u>, 882 F. Supp. 1141, 1157-58 (D. Mass. 1995) ("[C]ourts often separate patent issues from antitrust

counterclaim issues."); Skinder-Strauss Assocs. v. Mass.
Continuing Legal Educ., Inc., 870 F. Supp. 8, 11 (D. Mass. 1994)
("[P]roceedings on the counterclaims should be stayed until
after the resolution of the [intellectual property] action. This
procedure will avoid a waste of judicial and party resources on
the question of [the defendant's] intent in filing the
lawsuit."). Courts sometimes allow discovery on patent claims
and antitrust counterclaims to proceed in tandem, while
preserving the possibility of bifurcation at trial. See, e.g.,
Wi-LAN Inc. v. LG Elecs., Inc., 382 F. Supp. 3d 1012, 1026 (S.D.
Cal. 2019).

Nuance points out that if it succeeds in its original
patent suit, its success could demonstrate that the original
suit is not a sham, but rather merits Noerr-Pennington immunity.
See Skinder-Strauss, 870 F. Supp. at 11 (staying defendant's
antitrust counterclaims because resolution of the underlying
intellectual property dispute would create "a record for
determining whether the challenged litigation is objectively
meritless"); see also PREI, 508 U.S. 49, 60 n.5 (1993) ("A
winning lawsuit is by definition a reasonable effort at
petitioning for redress and therefore not a sham."); U.S.
Philips Corp. v. Sears Roebuck & Co., 55 F.3d 592, 597 (Fed.
Cir. 1995) ("The charge that Philips' patent infringement suit

in Florida was sham can not be deemed to have substance, for Philips prevailed in Florida on that issue.").

Nuance also argues it would be prejudiced by the cost of discovery regarding twenty years of its acquisition of patents and competitors. Indeed, the Supreme Court has cautioned that "proceeding to antitrust discovery can be expensive." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 558 (2007).

Omilia responds that it would be prejudiced by a delay in the resolution of its antitrust claims, as continuation of Nuance's anticompetitive activities will hinder Omilia's ability to enter the U.S. market.

In order to balance judicial economy and potential prejudice to the parties, the Court stays discovery regarding Omilia's Sherman Act counterclaim at least until after phase 1 of the patent litigation. However, the Court allows limited discovery regarding Nuance's pre-litigation conduct and communications with respect to Omilia and certain competitors named in the complaint, specifically ART, Voice Signal, Vlingo, and MModal. See Docket No. 44 ¶ 117-119. The Court also allows discovery on Omilia's claims of tortious interference. Finally, the Court allows discovery related to the anticompetitive effect of Nuance's mergers and acquisitions on the current market under the Clayton Act claim. The parties shall propose a discovery schedule within 30 days.

**CONCLUSION**

The Court **ALLOWS** the motion to dismiss with regard to Omilia's claim of common law unfair competition (Count 19) and **DENIES** the motion to dismiss with regard to Omilia's remaining antitrust and state law counterclaims. The parties shall submit a joint proposed discovery schedule within 30 days.

SO ORDERED.

/s/ PATTI B. SARIS
Patti B. Saris
United States District Judge