# IN THE UNITED STATES DISTRICT COURT FOR

# THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NUANCE COMMUNICATIONS, INC.,<br><br>      Plaintiff and Counterclaim Defendant,<br><br>v.<br><br>OMILIA NATURAL LANGUAGE SOLUTIONS, LTD.,<br><br>      Defendant and Counterclaim Plaintiff. | **Case No. 1:19-cv-11438-PBS** |

## NUANCE COMMUNICATIONS, INC.'S OPPOSITION TO OMILIA NATURAL LANGUAGE SOLUTIONS, LTD.'S MOTION FOR A PROTECTIVE ORDER FROM NUANCE'S DISCOVERY REQUESTS

**TABLE OF CONTENTS**

|      |      | Page |
| ---- | ---- | ---- |
| I.   | INTRODUCTION ................................................................................................1 | |
| II.  | FACTUAL BACKGROUND ...............................................................................2 | |
|      | A.   The Discovery at Issue ...............................................................................2 | |
|      | B.   The Discovery is Follow-Up to Omilia's Own Statements .......................3 | |
|      | C.   Allegations in First Amended Complaint ..................................................4 | |
|      | D.   Omilia's Shifting Narrative On Its Product Development Timeline .......5 | |
|      | E.   Omilia's Representations Concerning Training Data During a Hearing on Nuance's Motion to Compel ....................................................................5 | |
| III. | ARGUMENT .........................................................................................................6 | |
|      | A.   Legal Standards ..........................................................................................6 | |
|      | B.   Omilia's Motion is Untimely and Should Be Denied ..............................10 | |
|      | C.   Nuance's Requests Concerning Use of Live Customer Data As Training Data Are Relevant .....................................................................................10 | |
|      | D.   Nuance's Discovery Requests Concerning License Usage Are Relevant .............11 | |
|      | E.   The Requested Discovery is Proportional to the Needs of the Case.......12 | |
| IV.  | CONCLUSION ....................................................................................................13 | |

## TABLE OF AUTHORITIES

Page

**Cases**

*Aronstein v. Massachusetts Mut. Life Ins. Co.*,
   No. CV 15-12864-MGM, 2017 WL 2818993 (D. Mass. June 29, 2017) .................................. 8

*Autoridad de Carreteras y Transportacion v. Transcore Atl., Inc.*,
   319 F.R.D. 422 (D.P.R. 2016) .................................................................................................. 8

*Ayers v. Cont'l Cas. Co.*,
   240 F.R.D. 216 (N.D. W. Va. 2007) ......................................................................................... 9

*Barten v. State Farm Mut. Auto. Ins. Co.*,
   No. CV-12-00399-TUC-CKJ (LAB), 2014 WL 348215 (D. Ariz., Jan. 31, 2014) .............. 9, 10

*Brenford Envtl. Sys., L.P. v. Pipeliners of Puerto Rico, Inc.*,
   269 F.R.D. 143 (D.P.R. 2010) .................................................................................................. 9

*Cooper v. Charter Commc'ns, Inc.*,
   No. 12-cv-10530, 2016 WL 128099 (D. Mass. Jan. 12, 2016) ................................................. 9

*Equal Employment Opportunity Comm'n v. Baystate Med. Ctr., Inc.*,
   No. 3:16-CV-30086-MGM, 2017 WL 4883458 (D. Mass. Oct. 30, 2017) .............................. 8

*Equal Employment Opportunity Comm'n v. BDO USA, L.L.P.*,
   876 F.3d 690 (5th Cir. 2017) .................................................................................................... 8

*Gomez v. Martin Marietta Corp.*,
   50 F.3d 1511 (10th Cir. 1995) .................................................................................................. 6

*Guadalupe v. City of New York*,
   No. 15CIV0220CMJCF, 2016 WL 3570545 (S.D.N.Y. June 24, 2016) .................................. 8

*In re Crescent Beach Inn*,
   37 B.R. 894 (D. Me. 1984) ....................................................................................................... 8

*Johnson v. New Destiny Christian Ctr. Church, Inc.*,
   No. 615CV1698ORL37GJK, 2016 WL 11187163 (M.D. Fla. Aug. 19, 2016) ........................ 9

*Katz v. Liberty Power Corp., LLC*,
   No. 18-CV-10506-ADB, 2020 WL 3492469 (D. Mass. June 26, 2020) ............................. 9, 12

*Maxey v. Gen. Motors Corp.*,
  No. CIV. A. 3:95CV6-D-A, 1996 WL 692222 (N.D. Miss. Nov. 18, 1996) ............................ 9

*McKinney/Pearl Restaurant Partners, L.P., v. Metropolitan Life Ins. Co.*,
  322 F.R.D. 235 (N.D. Tex. 2016) ...................................................................................... 8

*Thibeault v. Square D Co.*,
  960 F.2d 239 (1st Cir. 1992) ............................................................................................. 7

*United States Dep't of Labor v. Randolph Cty. Sheltered Workshop, Inc.*,
  No. 2:16-CV-78, 2017 WL 10442120 (N.D. W. Va. Nov. 17, 2017) ............................... 7, 13

*United States ex rel. Ferris v. Afognak Native Corp.*,
  No. 3:15-CV-0150-HRH, 2018 WL 2656152 (D. Alaska June 4, 2018) ................................ 8

*VTT Mgmt. Inc. v. Fed. Ins. Co.*,
  No. CV-17-767-M, 2018 WL 5078111 (W.D. Okla. Oct. 17, 2018) ........................................ 6

*W Holding Co. v. Chartis Ins. Co. of Puerto Rico*,
  300 F.R.D. 43 (D.P.R. 2014) ............................................................................................. 7

*Wilson v. Jackson Nat'l Life Ins. Co.*,
  No. 3:15-cv-926-J-39JBT, 2017 WL 10402569 (M.D. Fla., Feb. 13, 2017) .......................... 8

*Young v. McGill*,
  No. 3:09CV1186 CSH TPS, 2012 WL 1660680 (D. Conn. May 11, 2012) ............................ 9

**Rules**

Fed. R. Civ. P. 26 Rule 26 ...................................................................................................... 7

Fed. R. Civ. P. 26 Rule 26(b)(1) ........................................................................................ 6, 7

Fed. R. Civ. P. 26 Rule 26(c) ............................................................................................. 8, 9

Fed. R. Civ. P. 26(c)(1)(A)-(H) ............................................................................................... 6

Federal Rule of Evidence 401 .............................................................................................. 7

**Other Authorities**

6 Moore's Federal Practice, § 26.42[1] (2019) …………………………………….… 7

Charles Alan Wright, Arthur R. Miller & Richard L. Marcus Fed. Prac. & Proc.Civ……... 6, 7, 9

Plaintiff and Counterclaim Defendant Nuance Communications, Inc. ("Nuance") hereby submits this Opposition to Defendant and Counterclaim Plaintiff Omilia Natural Language Solutions, Ltd.'s ("Omilia") Motion for a Protective Order from Nuance's Discovery Requests.

## I. INTRODUCTION

Having repeatedly opened the door into inquiry about what data Omilia claims to have used in quickly developing its ASR technology, and how that data was used, Omilia has now filed a motion for protective order (but only did so after having served objections and responses to all the discovery at issue). Omilia's motion is improper and should be denied.

At one time, Omilia was a reseller of Nuance's proprietary ASR technology, including Nuance Recognizer 9 and 10. D.N. 102 (First Amended Complaint ("FAC") ¶ 2. Nuance gave notice of its intent to terminate that reseller agreement in October 2013 and it did terminate in January 2014. *Id.* ¶¶ 2, 5. Shortly thereafter, Omilia launched an ASR product under its own brand. *Id.* ¶ 2. Starting after Nuance provided notice of termination, and intensifying significantly after that termination became effective on January 31, 2014, Omilia's CEO, Dimitris Vassos (or someone logged in as him) wrongfully downloaded *hundreds* of Nuance program files, including 70 different language models and products that it had not purchased from Nuance. *Id.* ¶ 5. In this litigation and elsewhere, Omilia has recently provided information that has triggered Nuance to uncover evidence showing that before and/or during the period of Omilia's purported ASR development, it had violated the terms of Omilia's reseller agreement with Nuance by recording actual end-customer calls flowing through Nuance's product for use as training data for their own ASR product development. *Id.* ¶ 2. Omilia used both the recordings of live customer calls and the improperly-downloaded Nuance software to facilitate the development of Omilia's deepASR engine in a time frame and to a quality that would not have otherwise been possible. *Id.* ¶ 5.

The discovery at issue relates to these facts. The information requested is undeniably relevant – relevant to allegations in the First Amended Complaint concerning the historical relationship of the parties, relevant to Omilia's defenses, relevant to issues Omilia has brought into

1

the case via motion practice, relevant to Omilia's pattern and practice of conduct, and relevant as follow-up to Omilia's own statements in pleadings and discovery.

Omilia's motion should be denied.

## II. FACTUAL BACKGROUND

### A. The Discovery at Issue

The motion seeks to shield Omilia from having to respond to three categories of discovery:

- **Requests for Production of Documents**. Nuance served its Second Set of Requests for Production on May 22, 2020. D.N. 147-3 (Kiernan Decl. Ex. C). Omilia served objections and responses to the Second Set of Requests for Production on June 24, 2020. D.N. 147-4 (Kiernan Decl. Ex. D).

- **Interrogatories**. Nuance served its Second Set of Interrogatories on June 15, 2020. D.N. 147 (Kiernan Decl. ¶ 8). Omilia served objections and responses to the Second Set of Interrogatories on July 24, 2020. (*Id.* ¶ 9).

- **Requests for Admission**. Nuance served its First Set of Requests for Admission on June 25, 2020. D.N. 147-5 (Kiernan Decl. Ex. E). Omilia served objections and responses to the First Set of Requests for Admission on July 27, 2020 (before filing its motion for protective order). D.N. 147-6 (Kiernan Decl. Ex. F).

The discovery fits into two groups: requests about Omilia's use of recordings of live customer calls (Request for Production Nos. 198-204, Interrogatory No. 9, and Request for Admission Nos. 2-13), and requests about Omilia's misuse of Nuance licenses under the 2011 Partner Agreement (Request for Production Nos. 189-194, 207, and Interrogatory No. 11).

On July 27, 2020, after it had served objections and responses to all three sets of discovery, Omilia filed its Motion for Protective Order. D.N. 146. Omilia has offered no argument or explanation as to why it could not have filed its motion before the discovery response deadlines.

2

### B.   The Discovery is Follow-Up to Omilia's Own Statements

In its initial set of interrogatories, Nuance's Interrogatory No. 2 requested, "For DiaManT and each plug-in or module of the Accused IVR Platform, … state the Date range over which each such platform, plug-in or module was conceived, designed, and developed." *See* D.N. 147-9 (Kiernan Decl. Ex. I) at 3.  Omilia has supplemented its response to this interrogatory twice, most recently on April 15, 2020.  In its Second Supplemental Response, served April 15, 2020, Omilia provided a lengthy narrative response, including the following statement concerning its development efforts after May 2014: "Omilia was able to quickly build the omASR versions **by utilizing … (ii) the training data that Omilia had collected over the years from its customers** …" *Id.* at 6 (emphasis added).

Given that Omilia had been a reseller of Nuance's ASR technology until the termination in January 2014 of the 2011 Partner Agreement between Nuance and Omilia (*see* FAC ¶¶ 20-21, 25, 30), these statements clearly referenced training data that Omilia collected "over the years" while it was still under the Partner Agreement (and predecessor agreements) with Nuance.

Shortly before it served this supplemental response, Omilia filed suit against Nuance in Canada, echoing its counterclaims in this action.  *Compare* D.N. 44 (Answer and Counterclaims) with D.N. 78 (copy of Canadian complaint).  In the Canadian complaint, Omilia provided further factual allegations about its product development efforts after termination of the 2011 Partner Agreement, including the statement, "Given the **data Omilia had the foresight to collect on prior projects**, it was able to develop a high performing ASR technology." *Id.* ¶ 43 (emphasis added).

What it appears that Omilia is saying in these statements is that it kept recordings of end users' calls – calls between consumers and their banks, their travel agencies, their cell phone providers, for example – and is using that body of actual live phone call data as its training data to develop ASR products.

The discovery requests at issue in Omilia's motion specifically follow up on Omilia's own statements.  *See, e.g.*, Requests for Production Nos. 198-204.  In particular, No. 201 quotes the Canadian complaint, and No. 202 quotes Omilia's Second Supplemental Response to Interrogatory

3

No. 2.  Similarly, Interrogatory No. 9 is a direct follow-up, asking Omilia to explain in detail its statement in Omilia's Second Supplemental Response to Interrogatory No. 2.  Likewise, Requests for Admission Nos. 2-13 all expressly reference these same two statements.

### C.  Allegations in First Amended Complaint

At around the same time period, as a result of investigations Nuance was prompted to conduct by Omilia's statements, Nuance discovered for the first time that, after termination of the 2011 Partner Agreement, during the period that Omilia claimed to have been developing its own ASR technology, and precisely when Omilia was "utilizing … the training data that [it] had collected over the years from its customers," Omilia was also engaged in massive and illicit downloading of Nuance software, including Nuance Recognizer and hundreds of language modules.  (*See* FAC ¶ 40).

Thus, as a result of these discoveries, on June 8, 2020, Nuance filed a First Amended Complaint, adding claims for copyright infringement, violation of the Computer Fraud and Abuse Act, violation of the Digital Millennium Copyright Act, conversion, and trespass to chattels, based on Nuance's discovery of Omilia's wrongful downloading and use of information from Nuance without authorization.  *See generally* FAC.

As alleged in the First Amended Complaint, customer data such as that described in Omilia's statements, was addressed by the prior agreements between Nuance and Omilia.  Under a Value-Added Reseller Agreement, Nuance was entitled to "full access and rights to all In-Service Data," which was defined to include audio inputs. *See* FAC ¶¶ 17-18.  Similarly, under the 2011 Partner Agreement, Nuance retained "all title, interests, and rights in and to" the Nuance software and all derivative works. *See id.* ¶¶ 20-23.  As Omilia has acknowledged, its use of Nuance technology was a key to its success. *Id.* ¶ 27.  On its website dating back to 2014, Omilia described various case studies for speech recognition projects that handled millions of interactions per year using Nuance's ASR technology.  *Id.* ¶ 28. This led Nuance to believe Omilia breached the 2011 Partnership Agreement because Omilia had not purchased enough license units from Nuance to

support the call volumes Omilia was reporting. *Id.* ¶¶ 28-29. Accordingly, due at least in part to this conduct by Omilia, Nuance terminated the 2011 Partner Agreement, effective January 31, 2014. *Id.* ¶ 30.

Request for Production Nos. 189-194 and 207, as well as Interrogatory No. 11, are directly related to the facts underlying these allegations in the First Amended Complaint.

After termination of the 2011 Partnership Agreement, Omilia has admitted that it "was not able to find a new partner that could provide adequate ASR technology" and therefore "decided to develop its own ASR technology". *Id.* ¶ 31. Omilia has claimed that "By 2014, [it] was deploying call centre solutions founded on 100% Omilia technology" including an "Omilia ASR." D.I. 78 (Canadian Complaint) at 44.

But, as Nuance recently discovered, at the same time that Omilia was purportedly developing its own "100% Omilia technology" ASR, it was also engaged in wholesale looting of Nuance's software by downloading hundreds of files of Nuance software from Nuance servers. FAC ¶¶ 39-40.

### D. Omilia's Shifting Narrative On Its Product Development Timeline

More recently, in conflict with Omilia's earlier representations that it launched an all-Omilia solution in 2014 after the termination of the 2011 Partner Agreement, Omilia has now stated that it did not release its omASR v.2 product until about April 2015. *See* D.N. 147-9 (Kiernan Decl. Ex. I, Second Supp. Resp. to Interrogatory No. 2) at 6. (Omilia never released its omASR v.1, and ultimately scrapped it. *See id.* at 5). Omilia has not explained what ASR technology was included in its product offerings during the fifteen months between the termination of the 2011 Partner Agreement in January 2014 and Omilia's product release in April 2015.

### E. Omilia's Representations Concerning Training Data During a Hearing on Nuance's Motion to Compel

On June 10, 2020, Nuance filed a motion to compel Omilia to produce source code, training data, and related technical documents. D.N. 103. At the first hearing on Nuance's motion to

5

compel, Omilia's counsel expressed a willingness to produce some training data, but as to other training data, resisted, explaining that Omilia's training data for the accused products:

> constitutes thousands of gigabytes of essentially transcribed speech, you know, customers calling their bank saying, Here's my bank account information, here's my Social Security Number, the log of data, and it's highly sensitive, personal data, and it's subject, as we note in our papers, to third-party consent issue.

D.N. 133 (July 1, 2020 Tr.) at 19:25-20:5.  In other words, Omilia once again confirmed, on the record, that it is using recordings of live customer calls as training data.  Indeed, Omilia's counsel went on to say, "an interrogatory might be an approach" to "obviate the need to produce…thousands of gigabytes of data and … potentially customer-sensitive information." *Id.* at 20:19-22.  This is precisely the same topic as to which Omilia now seeks a protective order shielding it from further discovery.

### III. ARGUMENT

#### A. Legal Standards

Rule 26(c) governs protective orders and provides that a "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  This rule "was adopted as a safeguard for the protection of parties and witnesses in view of the almost unlimited right of discovery given by Rule 26(b)(1)." 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Fed. Prac. & Proc. Civ. § 2036 (3d ed. 2019) ("Wright & Miller").  In order to protect parties and witnesses, courts are authorized to impose certain terms and conditions on a certain disclosure or discovery, specify what method should be used, or forbid it all together. Fed. R. Civ. P. 26(c)(1)(A)-(H).

**Relevance:** "Courts generally use a broad definition of relevance when determining whether discovery is permissible, because discovery is designed to help define and clarify the issues." *VTT Mgmt. Inc. v. Fed. Ins. Co.*, No. CV-17-767-M, 2018 WL 5078111, at *1 (W.D. Okla. Oct. 17, 2018) (quoting *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995)). Under Rule 26(b)(1), "[p]arties may obtain discovery regarding any non-privileged matter that is

relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Rule 26 promotes fairness both in the discovery process and at trial." *Thibeault v. Square D Co.*, 960 F.2d 239, 244 (1st Cir. 1992). "[A] fact need not be alleged in the Complaint for a party to be entitled to discovery of information concerning that fact" and that "[a] court's determination of whether a discovery request is 'relevant to any party's claim or defense' must look beyond the allegation of a claim or defense to the controlling substantive law." 6 Moore's Federal Practice, § 26.42[1] at 26-155 (2019). *W Holding Co. v. Chartis Ins. Co. of Puerto Rico*, 300 F.R.D. 43, 46 (D.P.R. 2014) ("Topics 1 and 2 [facts and allegations in the complaint and answer, including affirmative defenses] are clearly relevant and within the scope of discovery.") Even after the 2015 amendments to the Federal Rules, "background" information about the manner of operation of a party, or information that might provide a basis for impeachment, should still be available regularly." Wright & Miller § 2008 (Relevancy to the Claims or Defenses—Admissibility not Required). Federal Rule of Evidence 401 is also instructive. It defines "relevant" evidence as any evidence that "has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action." Fed. R. Evid. 401.

**Proportionality:** In 2015, Rule 26(b)(1) was amended to emphasize proportionality in connection with the scope of permissible discovery. Factors that must be considered in weighing proportionality include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). In particular, the burden of responding to discrete requests for admission is low, impacting the proportionality analysis. *United States Dep't of Labor v. Randolph Cty. Sheltered Workshop, Inc.*, No. 2:16-CV-78, 2017 WL 10442120, at *4 (N.D. W. Va. Nov. 17, 2017) ("The Court is uncertain how this or any of the below listed requests for admission are not proportional to the needs of the case considering they require only an admission or denial."). Further, "[w]ith respect to requests for

admission, it is particularly important to engage in a careful proportionality analysis, since the burden of responding to the requests may be more than offset by the fact that future discovery is limited to the extent that facts are admitted." *Guadalupe v. City of New York*, No. 15CIV0220CMJCF, 2016 WL 3570545, at *2 (S.D.N.Y. June 24, 2016). *See also McKinney/Pearl Restaurant Partners, L.P., v. Metropolitan Life Ins. Co.*, 322 F.R.D. 235, 255 (N.D. Tex. 2016) (564 requests for admission not disproportionate to needs of the case); *United States ex rel. Ferris v. Afognak Native Corp.*, No. 3:15-CV-0150-HRH, 2018 WL 2656152, at *2 (D. Alaska June 4, 2018) (537 requests for admission not excessive); *cf. Wilson v. Jackson Nat'l Life Ins. Co.*, No. 3:15-cv-926-J-39JBT, 2017 WL 10402569, at *1-*2 (M.D. Fla., Feb. 13, 2017) (527 requests for admission, attaching 5001 pages of exhibits not proportional to the needs of "simple breach of contract action").

**Burden of Persuasion:** The party seeking a protective order under Rule 26(c) bears the burden of showing that it is necessary by providing the court with a "particular and specific demonstration of fact" and not merely "stereotyped and conclusory statements." *Equal Employment Opportunity Comm'n v. BDO USA, L.L.P.*, 876 F.3d 690, 698 (5th Cir. 2017). "The party resisting discovery has the burden of showing specifically how each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive." *Equal Employment Opportunity Comm'n v. Baystate Med. Ctr., Inc.*, No. 3:16-CV-30086-MGM, 2017 WL 4883458, at *1-*2 (D. Mass. Oct. 30, 2017) ((citations and internal quotation marks omitted)); *Aronstein v. Massachusetts Mut. Life Ins. Co.*, No. CV 15-12864-MGM, 2017 WL 2818993, at *2 (D. Mass. June 29, 2017) (same); *See also Autoridad de Carreteras y Transportacion v. Transcore Atl., Inc.*, 319 F.R.D. 422, 427 (D.P.R. 2016) (same) (citations omitted); *In re Crescent Beach Inn*, 37 B.R. 894, 896 (D. Me. 1984) (party moving for protective order has burden to establish irrelevance).

This burden cannot be satisfied merely by asserting boilerplate and generalized objections. As this Court has noted:

> Boilerplate language that discovery is "overbroad and unduly burdensome" is insufficient to meet the "burden of showing by affidavit or otherwise that

8

> [discovery] would be unduly burdensome." *Cooper v. Charter Commc'ns, Inc.*, No. 12-cv-10530, 2016 WL 128099, at *2 (D. Mass. Jan. 12, 2016). "The mere statement by a party that [a] request for production was overly broad, burdensome, oppressive, and irrelevant is not adequate to voice a successful objection. On the contrary, the party resisting discovery must show specifically how each [request for production] is not relevant or how each question is overly broad, burdensome or oppressive." *Brenford Envtl. Sys., L.P. v. Pipeliners of Puerto Rico, Inc.*, 269 F.R.D. 143, 147 (D.P.R. 2010) (citations and internal quotation marks omitted).

*Katz v. Liberty Power Corp., LLC*, No. 18-CV-10506-ADB, 2020 WL 3492469, at *5 (D. Mass. June 26, 2020).

**Timing:** A party seeking a protective order under Rule 26(c) must file a motion *before* the due date for responding to the discovery. *Barten v. State Farm Mut. Auto. Ins. Co.*, No. CV-12-00399-TUC-CKJ (LAB), 2014 WL 348215, at *1 (D. Ariz., Jan. 31, 2014) ("[A] motion for a protective order is timely if made prior to the date set for producing discovery" and "[t]he failure to timely move for a protective order constitutes grounds for denying same." (internal citations and quotation marks omitted)). In *Barten*, the defendant timely served written objections to the discovery requests, and subsequently moved for a protective order after the response deadline. The court denied the motion for protective order as untimely, unless good cause is shown for the failure to file a timely motion. *Id.,* at *3. *See also Maxey v. Gen. Motors Corp.*, No. CIV. A. 3:95CV6-D-A, 1996 WL 692222, at *1 (N.D. Miss. Nov. 18, 1996) (motion for protective order untimely when filed after discovery response deadline, collecting cases and citing Wright & Miller § 2035); *Johnson v. New Destiny Christian Ctr. Church, Inc.*, No. 615CV1698ORL37GJK, 2016 WL 11187163, at *3 (M.D. Fla. Aug. 19, 2016) (party seeking a protective order from responding to written discovery requests must file the motion for protective order prior to the date its responses to discovery are due) (citing *Ayers v. Cont'l Cas. Co.*, 240 F.R.D. 216, 222 (N.D. W. Va. 2007) (failing to file a motion for protective order prior to the deadline for serving discovery responses results in the motion being denied and a waiver of objections)); *Young v. McGill*, No. 3:09CV1186 CSH TPS, 2012 WL 1660680, at *3 (D. Conn. May 11, 2012) (motion for protective order untimely when filed after deadline for responding to discovery requests).

9

### B. Omilia's Motion is Untimely and Should Be Denied

Omilia failed to file a motion for protective order until *after* it had served responses to all of the discovery at issue. Omilia has not acknowledged this timing requirement, and has not included any attempt at a good cause showing in its motion. Accordingly, its motion is untimely and should be summarily denied. *E.g., Barten,* 2014 WL 348215, at *1.[1]

### C. Nuance's Requests Concerning Use of Live Customer Data As Training Data Are Relevant

As discussed above, most of the discovery requests covered by Omilia's motion are follow-on requests to Omilia's own statements concerning its use of live customer data. This includes:

- Interrogatory No. 9
- Request for Production Nos. 198-204
- Requests for Admission Nos. 2-13

The requested discovery goes to the heart of the parties' competing narratives. Omilia contends that it did not take Nuance's intellectual property – which it defines narrowly as "hav[ing] access to the source code" of Nuance products (D.N. 147-9 (Kiernan Dec. Ex. I) at 6) – and in support of that narrative, cites its use of "*the training data that Omilia NLS had collected over the years from its customers ….*" *Id.* (emphasis added). Omilia's other statements, in the Canadian complaint and during the July 1 hearing on Nuance's motion to compel, reinforce this aspect of Omilia's narrative. But the statements actually support Nuance's narrative: that Omilia launched its product quickly by cutting many corners, including improper use of live customer calls as training data in violation of (*inter alia*) its contracts with Nuance, massive downloads of Nuance software after termination of the 2011 Partner Agreement, and infringement of Nuance's patents. These competing narratives are undeniably relevant and "of consequence" to this action. Now that

---

[1] Although some courts have considered an untimely motion for protective order where the moving party has demonstrated good cause for the delay, Omilia has made no effort here to show good cause for its delay.

Omilia has realized just how badly this narrative reflects on its credibility, it is trying to put the toothpaste back in the tube.

Nuance's discovery is an effort to understand and uncover the seriousness and scope of Omilia's corner-cutting. It is relevant to a pattern of conduct, to Omilia's credibility, and to Omilia's defenses in this case. By contrast, Omilia's arguments against relevance are nothing more than repeated assertions that the requested discovery is not probative to Nuance's asserted claims. Not only does Omilia take an unduly narrow view of relevance, but it fails even to substantiate its narrow argument with anything more than postulated conclusions. Omilia has therefore failed to carry its burden to establish that the requested discovery is not relevant.

### D.  Nuance's Discovery Requests Concerning License Usage Are Relevant

As Nuance has alleged in the FAC, one of Nuance's reasons for terminating the 2011 Partner Agreement was its suspicion that Omilia was misusing and under-reporting the licenses that it purchased from Nuance under that agreement. FAC ¶¶ 25-30.

The remainder of the Nuance discovery requests covered by Omilia's motion relate to its use of licenses under the 2011 Partner Agreement. These include:

- Requests for Production Nos. 189-194 and 207
- Interrogatory No. 11

These requests are directed to the extent of Omilia's misuse and under-reporting of licenses to Nuance's technology under the 2011 Partner Agreement. This information is also relevant to show Omilia's pattern and practice of corner-cutting and misconduct. Omilia's pending motion to dismiss Counts IX through XIII of the FAC has opened up another portal of relevance to this information. *See* D.N. 120-121. Counts IX through XIII assert causes of action for copyright infringement, DMCA and CFAA violations, conversion, and trespass to chattels, all based on Nuance's discovery that Omilia had illegally downloaded hundreds of files from Nuance's servers after termination of the 2011 Partner Agreement. Nuance has pled that the discovery rule applies, and delayed the commencement of the statute of limitations on those claims. *E.g.,* FAC ¶¶ 34-37,

11

194-198, 227-231, 238-242. Omilia has argued that Nuance's suspicions about Omilia's misuse and under-reporting of licenses was sufficient to place Nuance on notice that Omilia was up to no good and that the statutes of limitations on Omilia's illegal downloads should have started running at around the time of the termination. D.N. 121 at 2-12. This group of discovery requests is relevant to show the differences between Omilia's misconduct that led to the termination of the Partner Agreement and Omilia's recently-discovered illegal downloads. As such, it will tend to support Nuance's argument for application of the discovery rule to Counts IX through XIII of the FAC.

Again, Omilia's arguments against relevance are nothing more than repeated assertions that the requested discovery is not probative to Nuance's asserted claims. Not only does Omilia take an unduly narrow view of relevance, but it fails even to substantiate its narrow argument with anything more than postulated conclusions. And again, Omilia has failed to carry its burden to establish that the requested discovery is not relevant.

### E.   The Requested Discovery is Proportional to the Needs of the Case

The requested discovery is proportional to the needs of the case. It falls into two groups: one consists of a single interrogatory, seven closely related requests for production, and twelve requests for admission; the other group consists of seven requests for production and one interrogatory. Besides Omilia's effort to link proportionality to its conclusory assertions of irrelevance, Omilia devotes only a single paragraph to argument—with no evidentiary support— about the burdens that would be involved in collecting the requested information. Mot. at 18. This is insufficient. *Katz*, 2020 WL 3492469, at *5. Indeed, the issue of third party consent raised by Omilia is already addressed in the parties Stipulated Protective Order. *See* D.N. 59 (Stipulated Protective Order) § 12. Further, although Omilia states that it "does not object to responding to reasonable, proportionate discovery requests in relation to" its statement about collecting training data, it has not offered any proposed resolution other than complete prohibition of the discovery. Finally, there is no credible proportionality objection to Nuance's twelve requests for admission,

and Omilia offers none. *See Randolph Cty. Sheltered Workshop, Inc.*, 2017 WL 10442120, at *4 ("The Court is uncertain how this or any of the below listed requests for admission are not proportional to the needs of the case considering they require only an admission or denial.").

## IV. CONCLUSION

In an effort to avoid its discovery obligations, Omilia has defined relevance excessively narrowly and has failed to discharge its burden of demonstrating that the requested discovery is irrelevant under the proper broad standard. Moreover, Omilia fails to support its burden-related objections and fails to suggest any proportionality-related limitations on the scope of the requested discovery and instead simply seeks to block all discovery into the two topics covered by this motion. For the foregoing reasons, Nuance submits that Omilia's motion for a protective order should be denied.

Date:  August 10, 2020                         Respectfully submitted,


                                               */s/ Christian E. Mammen*
                                               **WOMBLE BOND DICKINSON (US) LLP**

                                               David Greenbaum (*admitted pro hac vice*)
                                               **Nuance Communications, Inc.**
                                               1111 Macarthur Boulevard
                                               Mahwah, NJ 07430
                                               (857) 214-5524
                                               david.greenbaum@nuance.com

Jennifer Itzkoff (MA BBO No. 675694)
**WOMBLE BOND DICKINSON (US) LLP**
Independence Wharf
470 Atlantic Avenue, Suite 600
Boston, MA 02110
Telephone: (857) 287-3142
Jennifer.Itzkoff@wbd-us.com

Christian E. Mammen (*admitted pro hac vice*)
Carrie Richey (*admitted pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
1841 Page Mill Road, Suite 200
Palo Alto, CA 94304
Telephone: (408) 341-3067
Chris.Mammen@wbd-us.com
Telephone: (408) 341-3060
Carrie.Richey@wbd-us.com

Christine H. Dupriest (*admitted pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
271 17th Street, Suite 2400
Atlanta, Georgia 30363
Telephone: (404) 962-7538
Christine.Dupriest@wbd-us.com

Kristin Lamb (*admitted pro hac vice*)
**WOMBLE BOND DICKINSON (US) LLP**
811 Main Street, Suite 3130
Houston, TX 77002
Telephone: (346) 998-7843
Kristin.Lamb@wbd-us.com

***Attorneys for Plaintiff Nuance Communications, Inc.***

## **CERTIFICATE OF SERVICE**

I hereby certify that this document will be filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 10, 2020.

        /s/ *Christian E. Mammen*
        Christian E. Mammen